## COMMONWEALTH *vs.* KIM ANDREWS.

Suffolk. February 3, 1998. - May 14, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Identification. Evidence,* Identification, Joint enterprise. *Practice, Criminal,* Motion to suppress, Required finding, Assistance of counsel, Argument by prosecutor, Instructions to jury, Reasonable doubt. *Homicide. Intent. Joint Enterprise. Constitutional Law,* Assistance of counsel.

At the hearing on a motion to suppress out-of-court and in-court identifications of a criminal defendant, the defendant failed to demonstrate that the police "coached" the witnesses concerning the description of the suspect so as to render the identification procedures impermissibly suggestive, and the judge correctly ruled that the identifications were admissible in evidence. [437-439]

At the trial of an indictment for murder in the first degree, the judge did not err in denying the defendant's three motions for a required finding of not guilty, where the evidence was more than sufficient to warrant a finding that the defendant committed the murder with deliberate premeditation or that the defendant acted as a joint venturer. [439-442]

A criminal defendant failed to demonstrate ineffective assistance of his trial counsel in failing to pursue a "second gunman" theory of defense or in failing to argue for a finding on a lesser included offense, where such tactics either would not have significantly influenced the verdict or were incompatible with the defendant's primary defense. [442-443]

At a murder trial, certain improper remarks in a prosecutor's closing argument did not create a substantial likelihood of a miscarriage of justice, in light of the entire argument, the evidence at trial,. and the jury instructions. [443-444]

In the circumstances of a criminal trial, error, if any, in the judge's use of the phrase "moral certainty" in his instructions concerning reasonable doubt did not create a substantial likelihood of a miscarriage of justice. [444-445]

There was no basis on the record of a murder trial for this court to grant any relief under G. L. c. 278, § 33E. [445]

INDICTMENTS found and returned in the Superior Court Department on February 14, 1995.

The cases were tried before *James D. McDaniel, Jr.,* J.

*Mary F. Costello* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney (*James*

*W. Coffey*, Assistant District Attorney, with her) for the Commonwealth.

IRELAND, J. A jury convicted the defendant of murder in the first degree on grounds of deliberate premeditation and extreme atrocity or cruelty. The jury also convicted the defendant of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (*a*) (6). The defendant has appealed from the convictions claiming that (1) identification evidence should have been suppressed; (2) his motions for a required finding of not guilty of murder in the first degree should have been allowed; (3) he did not receive effective assistance from his trial counsel; (4) certain comments by the prosecutor during closing remarks were inflammatory, were not based on evidence, and, so, created the substantial likelihood of a miscarriage of justice; and (5) the jury instructions describing reasonable doubt were faulty. Although the defendant makes no specific request, we are also obligated under G. L. c. 278, § 33E, to review the record to determine if the defendant is entitled to a new trial or a reduction in the degree of his guilt. For the reasons set forth below, we affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E.

The jury heard the following evidence. Two privately employed security guards, Rui Carvalho and Earl Lacaillade (the guards), were on foot patrol in the Canfield Gardens housing complex in the Roxbury section of Boston on the afternoon of December 1, 1994. At about 4:30 P.M., the guards heard three gunshots coming from Kendall Street, approximately fifty to sixty yards away. Both guards drew their guns and ran in the direction of the gunshots. They saw three black males standing on the sidewalk along Kendall Street.

On seeing the guards, two of the males fled down Kendall Street toward Shawmut Avenue. One of the two males was holding a handgun. The third male (later identified as the defendant) fled in another direction toward Ditmus Court. The guards pursued the defendant as he ran around the corner of a building. After coming around the corner, the guards stopped and saw the defendant, with his right arm raised and extended, standing about eight feet from the victim, Jimmy Hinson. Hinson was backing away from the defendant, with his arms raised in a defensive manner. Hinson fell backward onto the steps of a building on Ditmus Court, and the defendant fired his gun four times at the victim. Carvalho was standing some fifteen to

twenty feet from the defendant at the time of the shooting; Lacaillade was slightly farther away. Carvalho immediately recognized the shooter as the same young, light-skinned black male whom he had seen "over one hundred times" in recent weeks in the general area around the Canfield Gardens housing complex.

The defendant made eye contact for one second or more with Carvalho, then fled, with Carvalho in pursuit. Carvalho gave up the pursuit after a block and returned to the crime scene. Lacaillade, who had stayed behind to assist the victim, immediately radioed for police assistance. Hinson was transported by ambulance to Boston City Hospital, where he died three days later from massive internal injuries caused by the gunshot wounds.

On the evening of the incident, Boston police Detective Charles Horsley separately interviewed Carvalho and Lacaillade. The next day each man was separately shown an identical photographic array of nine pictures, including one of the defendant. Carvalho immediately selected the defendant's picture, but Lacaillade was unable to make a positive identification from the array. The police obtained a warrant for the defendant's arrest. After learning of the warrant, the defendant voluntarily surrendered on January 24, 1995. On February 10, 1995, Carvalho and Lacaillade separately identified the defendant from a lineup of young black males.

The jury also heard testimony from certain experts, including John Seay, a ballistician from the Boston police department. Seay testified that he had recovered from the crime scene (1) four discharged nine millimeter cartridges; (2) a spent nine millimeter bullet; (3) three bullet fragments (each too small to determine the type or caliber); and (4) a spent .44 caliber hollow point bullet. In addition, the medical examiner's office had given Seay three other hollow point .44 caliber bullets that had been removed from the victim's body. Seay concluded that all of the nine millimeter cartridges and the spent nine millimeter bullet had come from the same gun. Seay also concluded that the spent .44 caliber bullet recovered from the crime scene had been fired from the same gun as the three spent .44 caliber bullets recovered from the victim's body. The police were unable to recover either gun.

Dr. Stanton Kessler, a medical examiner for the Commonwealth, testified that Hinson had sustained four separate

gunshot wounds: one to his right arm, through which the bullet had passed completely; one to his abdominal wall, causing massive damage to various internal organs; one to his neck; and one to his knee and groin, causing a wound Dr. Kessler described as "in and of itself . . . a lethal wound." According to Dr. Kessler, many of the victim's internal organs had been severely damaged by the "blast effect" of the hollow point bullets used in the shooting. Doctors at Boston City Hospital were unable to close or suture the victim's wounds owing to the gravity of the internal injuries. The victim died three days later.

Finally, jurors heard additional testimony from Carvalho and from two Boston police officers who each had seen the defendant in the neighborhood of the crime scene in the weeks before the shooting but had not seen him at all after that. That evidence would warrant an inference that the defendant was aware that he may have been positively identified as the shooter by at least one of the security guards and, hence, wished to avoid being seen again in the vicinity of the crime scene.

1. *Identification evidence.* The defendant unsuccessfully sought to suppress evidence from the photographic array and the police lineups which positively identified him as the shooter. The trial judge conducted a suppression hearing on the defendant's motion. The judge found that Carvalho described the shooter (shortly after the incident) as "a light skinned black male . . . about 5 foot 6 to 5 foot 7 inches tall"[1] and that Lacaillade had initially described the shooter as "5 foot 4 inches to 5 foot 5 inches [and] hispanic." The judge also found that Lacaillade later gave a similar description to another detective, but when asked by the detective whether the shooter might have been "a light skinned black male," Lacaillade conceded that it was possible.

The judge found further that, on the day after the shooting, the guards "independently viewed a 9 to 10 photo array of young black males" and that Carvalho selected the defendant as the shooter, but that Lacaillade was unable to identify any of the individuals depicted in the array as the shooter. Finally, the judge found that the guards later viewed a lineup independently and that they each identified the defendant as the shooter. The

---

[1]Later that night, Carvalho gave a similar description to a detective at the police station, but gave the shooter's height as "five-four or five-five." However, the judge did not include this as part of his findings with respect to the suppression motion.

judge concluded that neither the photographic array nor the lineup was impermissibly suggestive.

It was the defendant's initial burden at the suppression hearing to demonstrate "by a preponderance of the evidence, that the 'witness[es] [were] subjected by the State to a confrontation that was unnecessarily suggestive and thus offensive to due process.' " *Commonwealth* v. *Johnson*, 420 Mass. 458, 463 (1995), quoting *Commonwealth* v. *Botelho*, 369 Mass. 860, 866 (1976). The pertinent question was not whether there may have been a mistaken identification, but whether any possible mistake in identifying the defendant was, or might have been, caused by improper suggestions made by the police. See *Commonwealth* v. *Warren*, 403 Mass. 137, 139 (1988). The determination whether the photographic arrays were unnecessarily suggestive and, hence, offensive to the defendant's due process rights is made according to "the totality of the circumstances surrounding it." *Botelho*, *supra* at 867, quoting *Stovall* v. *Denno*, 388 U.S. 293, 302 (1967).

The defendant argues that the suppression motion should have been allowed because (1) the photographic array was impermissibly suggestive as a result of the police detective's "coaching" the guards that the shooter might have been a light-skinned black man instead of Hispanic; and (2) the Commonwealth failed to demonstrate by clear and convincing evidence that the lineup identifications or the in-court identifications were the product of an independent source.[2]

The judge was warranted in concluding that the defendant had not met his initial burden at the suppression hearing of

---

[2]Had unfair suggestiveness been established at the suppression hearing, Carvalho's positive identification of the defendant from the photographic array would have been subject to the rule of per se exclusion according to due process requirements in art. 12 of the Declaration of Rights of the Massachusetts Constitution. See *Commonwealth* v. *Johnson*, 420 Mass. 458, 464-472 (1995) (reaffirming rule of per se exclusion of unnecessarily suggestive identifications as stated in *Commonwealth* v. *Botelho*, 369 Mass. 860, 866 [1976], and declining to adopt as State constitutional standard the "reliability test" in *Manson* v. *Braithwaite*, 432 U.S. 98, 114 [1977], for Federal due process claims). Moreover, the Commonwealth would have been barred from using Carvalho's and Lacaillade's subsequent police lineup identifications of the defendant, as well as their in-court identifications of the defendant, unless the prosecutor could show by clear and convincing evidence at the suppression hearing that those identifications were not the product of an initial unfairly suggestive procedure and were derived, instead, from another, independent source. See *Johnson*, *supra* at 463.

showing impermissible suggestiveness. There is no indication in the record of any police coaching of Carvalho's description of the shooter. Although Carvalho's estimate of the shooter's height changed slightly from his initial description, he consistently described the shooter as a light-skinned black male. The defendant's argument that the police impermissibly coached Carvahlo thus fails at the outset.

Lacaillade, however, had initially described the shooter as Hispanic and had indicated that the shooter might have been a light-skinned black man only after the police detective had asked whether this was a possibility. The judge concluded that the detective was not attempting to coach Lacaillade, but simply trying to get a better description in preparation for the police investigation of the shooting. The judge was warranted in concluding that Lacaillade had not been coached. There is nothing in the record to indicate that the police had already identified the defendant (or anyone else) as a suspect at the time of the detective's interview with Lacaillade[3] or that the police had any other motive to coach him. Further, the defendant fails to state why the judge's conclusion concerning the nature of the detective's question to Lacaillade was incorrect, nor does he cite any authority to support his position that the detective's question to Lacaillade constituted impermissible suggestiveness, either as a per se rule or under the facts of this case. The defendant's argument that the police impermissibly coached Lacaillade thus fails as well.

Because the judge correctly determined that the defendant had not met his initial burden at the suppression hearing of showing impermissible suggestiveness, we need not decide whether the Commonwealth showed that the lineup identifications or the in-court identifications were the product of an independent source. The identification evidence was thus properly admitted at the trial.

2. *Required finding of not guilty.* The defendant moved three times for a required finding of not guilty on all charges — after the Commonwealth rested, after the close of evidence, and after

[3]Although Carvalho indicated in his initial discussion with the police that he recognized the shooter, he also told them that he did not know the person's name.

the verdict.[4] The judge denied each motion. The defendant now argues that the Commonwealth's evidence was insufficient as a matter of law to sustain his conviction of deliberately premeditated murder, either as a principal or as a joint venturer with the two other males who fled the scene. The Commonwealth's case proceeded on both theories of culpability. The jury, however, were not asked to specify which theory or theories they used to arrive at their verdict.

A defendant is entitled to a required finding of not guilty only when "the evidence is insufficient as a matter of law to sustain a conviction on the charge." Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). See *Commonwealth* v. *Williams*, 422 Mass. 111, 120 (1996). On appeal, we are to determine whether, upon "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). We may consider circumstantial evidence of guilt together with inferences drawn therefrom that appear reasonable and not overly remote. See *Commonwealth* v. *Cullen*, 395 Mass. 225, 230 (1985). Inferences, however, "need not be inescapable or necessary." *Id.*

Gauged by these standards, the defendant's motions were properly denied. The Commonwealth's evidence, if believed, showed that the defendant, in the company of two other males, one of whom was also armed, fired four shots at close range at an unarmed victim who died as a result of gunshot wounds. That evidence was more than sufficient to warrant a finding that the murder was committed by the defendant with deliberate premeditation.[5] The evidence warranted a finding that the defendant's resolve to kill the victim was the product of cool

[4]The defendant advances no argument in his brief that he was entitled to a required finding of not guilty on the separate weapons charge. That claim, therefore, is deemed waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[5]We, therefore, need not dwell in any depth on the alternate basis for the verdict of murder in the first degree, that of extreme atrocity or cruelty. See *Commonwealth* v. *Chipman*, 418 Mass. 262, 270 n.5 (1994), and cases cited, where we declined to examine the issue of extreme atrocity or cruelty because the conviction of first degree murder by reason of deliberate premeditation was warranted by the evidence. It suffices to say that several of the factors outlined in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), for murder

reflection, *Commonwealth* v. *Davis*, 403 Mass. 575, 582 (1988), even if formed in a matter of seconds. *Commonwealth* v. *Luce*, 399 Mass. 479, 485 (1987). The defendant carried a loaded gun to the crime scene, as did one of the other males. See *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 65 (1989) (sufficient evidence of deliberate premeditation, where both defendants carried loaded guns at the crime scene, even if only one defendant fired the fatal shot). Two witnesses saw the defendant fire four times at the victim, who was backing away and attempting to shield himself. See *Commonwealth* v. *Good*, 409 Mass. 612, 618 (1991) (sufficient evidence present of deliberate premeditation, where defendant walked up to victim and fired three times at victim at close range).

The evidence was also sufficient to convict the defendant as a joint venturer. Two witnesses (the guards) testified that they heard shots. Almost immediately thereafter, the guards saw the defendant in the company of two other individuals. All three fled the scene, and one of the other individuals (in addition to the defendant) was carrying a handgun. Even if the victim had been mortally wounded during the first volley of gunfire, the jury were warranted in inferring that the defendant still could have been found guilty of deliberately premeditated murder as a joint venturer, where he was observed moments later firing a gun directly at the victim. "[E]ven if the defendant were not the person who fired the fatal shot, there was ample evidence which, if believed, justified the jurors in convicting the defendant of deliberately premeditated murder on the basis of joint enterprise." *Commonwealth* v. *Fernette*, 398 Mass. 658, 669 (1986).

Evidence identifying the defendant was also more than sufficient to withstand the motions. Carvalho knew who the shooter was (having seen him over one hundred times before), and he had a good look at the shooter during the crime. Within hours of the incident, he identified the defendant without equivocation as the perpetrator and, two months later, positively identified the defendant again. See *Commonwealth* v. *Marsh*, 26 Mass. App. Ct. 933, 934 (1988) (fact that only one of two eyewitnesses to robbery could identify defendant as perpetrator was

---

by extreme atrocity or cruelty are here present, including massive injuries inflicted on the unarmed victim by means of hollow point bullets (which carry significant destructive force); the disproportion between the means necessary to cause death and those used; and, finally, the conscious suffering endured by the victim after the shooting.

sufficient to defeat motion for required finding of not guilty on issue of perpetrator's identity). Contrast *Commonwealth* v. *Lane*, 27 Mass. App. Ct. 527 (1989) (defendant entitled to required finding of not guilty on issue of identity, where victim first identified defendant as her assailant, later identified another individual as her assailant, and identity of perpetrator was, therefore, left to conjecture). The judge properly denied the motions.

3. *Ineffective assistance of counsel.* The defendant faults his trial counsel on two general fronts. First, he contends that his lawyer failed to conduct a reasonable inquiry to learn the identity of a second shooter, then failed adequately to pursue a second gunman theory of defense at trial. To that end, trial counsel, according to the defendant, should have conducted an aggressive cross-examination of the Commonwealth's ballistician,[6] whose testimony linked the defendant to the murder weapon, and should also have retained another ballistician as an expert who might have helped establish that a second shooter, not the defendant, had fired the murder weapon. Second, the defendant faults his trial counsel for not arguing before the jury for a finding on a lesser included offense to murder in the first degree. We briefly examine each contention, applying to this capital case the standard whether possible error by counsel resulted in a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Carter*, 423 Mass. 506, 514 (1996).

Where the Commonwealth proceeded on alternate theories of principal and joint venture liability, the identity of a second gunman was not essential to the case, because the defendant need not have fired the fatal shot to be found guilty of the murder. See *Commonwealth* v. *Brooks*, 422 Mass. 574, 577 (1996); *Commonwealth* v. *Cohen*, 412 Mass. 375, 379-380 (1992), and cases cited (where, as here, second assailant was not identified). As we have stated, sufficient circumstantial evidence supported a joint venture theory of liability (i.e., defendant's presence with a loaded weapon at the crime scene in the company of two others, one of whom could reasonably be inferred also to have fired a loaded weapon, and simultaneous flight of all three individuals).

The defendant fails to explain how procuring a ballistics expert or aggressively cross-examining the Commonwealth's

---

[6]The defendant's trial counsel did not cross-examine the ballistician at all.

ballistician would have accomplished something material for his defense. The evidence showed that the defendant fired four shots at the victim and that the victim was hit four times — at least three times with .44 caliber hollow point bullets fired from one gun (three such bullets were recovered from the victim's body) and a fourth time through the arm with a bullet of undetermined caliber. The jury could reasonably have inferred that the fourth shot, too, had come from the .44 caliber handgun,[7] and that the defendant was armed with and had fired that weapon. Any failure by trial counsel to identify another assailant or to pursue a second assailant theory did not detract significantly from the defense and could not have significantly influenced the verdict.

Defense counsel also was not ineffective in failing to argue during his closing argument for a finding on a lesser included offense, for to do so would have been totally incompatible with his primary defense of mistaken identity.[8] See *Commonwealth* v. *Roberts*, 407 Mass. 731, 739 (1990); *Commonwealth* v. *Zangari*, 42 Mass. App. Ct. 931, 933 (1997) (where defense was one of misidentification and alibi, it would have been "tactically awkward" to argue for charge on lesser included offense, and hence, counsel was not ineffective by failing to do so).

4. *Prosecutor's closing remarks.* During summation, the prosecutor emphasized to the jury that the defendant had "vanished" from the crime scene and was not seen in that vicinity again. The defendant objected to the remark. The prosecutor also characterized the shooting as an "ambush" and an "execution," to which the defendant did not object at his trial. The defendant now claims that no evidence supported any of the described remarks and, therefore, the case must be remanded for prosecutorial error.

The first remark — that the defendant had vanished from the scene — was based on properly admitted evidence of flight and, so, was not unfairly prejudicial. The prosecutor was entitled to argue the evidence and its reasonable inferences. See *Commonwealth* v. *Paradise*, 405 Mass. 141, 152 (1989). The prosecutor reasonably could contend that the defendant's disap-

---

[7]The ballistician recovered a fourth .44 caliber hollow point bullet from the crime scene and concluded that it had been fired from the same gun as the three .44 caliber hollow point bullets recovered from the victim's body.

[8]Defense counsel asked for — and received — an appropriate instruction on lesser included offenses to murder in the first degree.

pearance from a place in which he had been regularly seen in the weeks prior to the murder evinced a consciousness of guilt on his part.

The other two remarks — that the victim had been "ambushed" or "executed" by the defendant — were improper and went beyond mere hyperbole. No evidence supported those characterizations of the shooting. Looked at in the context of the entire summation, the evidence at trial, and the jury instructions, see *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992), the remarks, while inappropriate, did not, however, create a substantial likelihood of a miscarriage of justice. Hence, reversal of the convictions on the basis of improper remarks by the prosecutor is not warranted.

5. *Jury instructions on reasonable doubt.* The defendant claims reversible, constitutional error in the judge's instructions to the jury. According to the defendant, the instructions equated reasonable doubt with "moral certainty" and failed to explain or clarify that phrase. The defendant did not object to the reasonable doubt portion of the charge; hence we review his claim only to determine whether any possible error in the charge created the substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Torres*, 420 Mass. 479, 483 (1995).

The instructions, key portions of which appear below in the margin,[9] emphasized to jurors that they must have "an abiding conviction to a moral certainty of the truth of the . . . charges" against the defendant. Our cases have upheld the use of "moral certainty" language "if it is linked with language that lends content to the phrase." *Commonwealth* v. *Bonds*, 424 Mass. 698, 703 (1997), quoting *Commonwealth* v. *Pinckney*, 419 Mass. 341, 345 (1995). Here, the judge used "moral certainty" in the context of the traditional instruction from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). This is sufficient. See *Commonwealth* v. *Wilson, ante* 336, 355 (1998), citing *Commonwealth* v. *Latimore*, 423 Mass. 129, 140 (1996). Moreover, the phrase "moral certainty" was not explained or illustrated

---

[9]The judge instructed in part as follows: "Reasonable doubt is that state of the case when after the entire comparison and consideration of all of the evidence the minds of the jurors are left in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge or charges . . . but the evidence must establish the truth or the facts to a reasonable and moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of you, the jurors, who are bound to act conscientiously upon it."

with the sort of examples from everyday life that could "lessen the degree of certainty required to an unconstitutional level." *Bonds*, *supra* at 703. There was no constitutional error in the instruction.[10]

6. *G. L. c. 278, § 33E.* There is no basis under G. L. c. 278, § 33E, for a reduction in the degree of the defendant's culpability or the grant of a new trial. The evidence of the defendant's guilt was overwhelming, and his claims of error, either individually or in the aggregate, are without merit.

*Judgments affirmed.*

---

[10]We note also that the language in the judge's instruction was specifically requested by the defendant.