Burnes, J.
INTRODUCTION
The defendant, Jose Duarte (“Duarte”), moves to suppress the identification of him by an eye witness, Wendell Diaz (“Diaz”). Diaz made an identification both from a photo array and during a police lineup. The defendant has no complaints about the police procedures. He does not say that the activities of the police were unduly suggestive in anyway. He argues that the activities of third persons were so unduly suggestive that the identifications should be suppressed. For the following reasons, the Court denies the motion to suppress.
FINDINGS OF FACT
The Court heard from Officer Keeler, a twenty-year veteran of the Boston Police Department and a member of the homicide unit, and reviewed the videotape of the identification of the defendant made by Diaz at a line-up.[1] From that evidence and the reasonable inferences drawn from it, the Court makes the following findings of fact.
On the evening of August 23, 1996, a young man was shot in a park in Roxbury. Three days later, he died. That same evening, just before the shooting, Diaz had walked through the park, stopped to talk to several people and then continued along Dennis Street to his home.
The police did not speak to Diaz at the scene. They were directed to his address and arrived there about 2:30 a.m. on August 24, 1996. They did not know him before. Officer Keeler found Diaz in bed, fully clothed and under the covers. He was approximately sixteen years old. He went with the police officer to Area B, unaccompanied by any friend, parent or other family member. Officer Keeler asked him questions about what happened in the park. Diaz expressed great fear for his safety and for the safety of his family. Officer Keeler arranged to speak with him later. Diaz did not identify anyone at that time.
On August 26, 1996, Officer Keeler spoke to Diaz, picked him up and took him to Area B. Again, Diaz was unaccompanied by an adult. Diaz told Keeler that he was- walking home on the evening of August 23, 1996. He went into the park. There were three young men there. Some or all were smoking marijuana. Diaz saw two young men go by on bicycles. When they stopped, he was concerned. He left to continue walking home. As he looked over at the two young men on bikes, he saw them fixing masks. Diaz knew one of them as Ed. As they went by him on their bikes, he glanced over at them because he was afraid. He continued home and heard a gunshot from home.
Diaz said that initially he thought that the other person was someone from Dennis Street. Over the weekend, his friends told him that the other person was “Zada.” Diaz knew Zada and he had previously seen Zada with Ed riding bikes. Diaz knew independently from his friends that Zada hung around with Ed. The conversations between Diaz and his friends were characterized as conversations “just like my friends, we talked about it.” Diaz did not tell Officer Keeler any of the specifics of the conversations other than that a friend named Manuel and Manuel’s sister had told him the man with Ed that night was not the man from Dennis Street but that it was Zada. Diaz did tell Officer Keeler that he had several conversations over the weekend with Manuel and his sister, at least about his identification of the man with Ed the night of August 23.
The police did not show Diaz a photo array right away. They did not know who Zada was. In November, they showed him two photo arrays, one with Ed in it and one with Duarte (Zada) in it. The police had not had any substantive contact with Diaz between the August 26th shooting and the presentation of the photo array on November 6, 1996. Diaz was in a room fourteen feet by sixteen feet. There were four photographs in each case for a total of eight photographs. The photographs were put on a table away from the witness. Diaz was told that the people who were there that night may or may not be in the array, and he should be careful in looking at the array. He was told that the photographs may lighten or darken someone’s skin and that the facial hair may be different. He was also told that if he recognized someone that they had *479 been talking about to please let the police know. He identified Ed in the first array. In the second array, he identified Duarte. He said that this was the person with Ed on Dennis Street that night and that it was the person he knew as Zada.
Diaz’s grand juiy testimony was to the same effect. He testified that the photograph resembled the person he knew in the past and that he saw on Dennis Street that evening.
On October 17, 1997, the police arranged a lineup. Diaz was not shown the photographs before the line up and there were no discussions about identification of the photographs and the line up. Diaz was told that the person who was with Ed that evening may or may not be in the line up. Diaz was also told that he would not be seen during the line up. Diaz identified Duarte, one of eight people in the line up, as the individual he saw on Dennis Street that night.
Diaz had also told the police that the person he had referred to originally as the man who lived on Dennis Street and Zada are extremely similar in their appearance.
Duarte’s hair was different on each occasion that Diaz had seen him. On August 23, 1996, he had com rows, in the photo array he had an Afro and in the line up his hair was short. There was no one in the photo array with corn rows.
The court reviewed a videotape of the line up. There were eight individuals. Diaz was behind a one-way glass window. He was told to step forward to look at each of the eight individuals as they stepped forward and turned one complete turn. Diaz asked number 6 (Duarte) to step forward again so he could see him again. He identified Duarte as the person who was with Ed on August 23, 1996.
CONCLUSIONS OF LAW
“In order to suppress a photographic identification, the defendant must [initially] show by a preponderance of the evidence that, in light of the totality of the circumstances, the procedures employed were so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law.” Commonwealth v. Payne, 426 Mass. 692, 694 (1998) quoting Commonwealth v. Miles, 420 Mass. 67, 77 (1995). Ordinarily, the issue is whether the activities of the police and the procedures used in the identification were the suggestive activities which are being challenged. See, e.g., Commonwealth v. Andrews, 427 Mass. 434, 438 (1998) (whether any possible mistake in identifying the defendant was, or might have been, caused by improper suggestions made by the police). Here, there is no complaint by the defendant as to the procedures used by the police in the photographic array or the line up.
There are some circumstances, rare though they may be, where a motion to suppress may be allowed because of activities of third parties. See Commonwealth v. Mahnke, 368 Mass. 662 (1975) (defendant abducted and threatened by friends of victim, statement determined to be not voluntary). The court in Mahnke said that we should recognize that “statements extracted by a howling lynch mob or a lawless private pack of vigilantes from a terrorized pliable suspect are repugnant to due process mandates of fundamental fairness and protection against compulsory self incrimination.” Id. at 681. Mahnke is the only case which could possibly support the suppression of this evidence on due process grounds. However, there is no evidence or inference from the evidence which would indicate that Mahnke would apply here.
There are a number of other cases which indicate that third party activity does not require suppression. See, e.g., Commonwealth v. Payne, 426 Mass. 692, 695 (1998) (“the fact that the witnesses had previously seen his picture in newspapers and on television did not invalidate the identification”); Commonwealth v. Dyer, 389 Mass. 677, 684 (1983) (defendant was identified through exposure in the media during pretrial proceedings); Commonwealth v. Hogg, 4 Mass.App.Ct. 225, 228 (1976) (victim who learned of defendants’ names from a third party prior to photo array was not unnecessarily suggestive). In Hogg, Corcoran, a victim, informed Hamilton, a second victim, of the defendants’ names prior to Hamilton’s view of an array of photographs at the police station. Although Hamilton was aware of the defendants names, no names were included in the photo array and he did not know whether the photographs of the individuals Corcoran identified were included in the array. Id. Hamilton identified the defendants from the photo array and the defendants moved to suppress this identification. On appeal from the trial court’s denial of the defendants’ motion to suppress, the court found that the mere knowledge of the defendants’ names from Corcoran was not the product of “impermissible suggestion.” Id. at 227.
The defendant argues, however, that there is a further basis to suppress this evidence, citing Commonwealth v. Jones, 423 Mass. 99 (1986). In Jones, the witness saw the defendant on two occasions in court, neither of which occasions were planned or orchestrated by the Commonwealth. Id. at 103. The evidence was that the witness had not known the defendant before and had only moments to look at him the evening of the crime. Id. at 101-02. The witness saw the defendant in court shackled with a co-defendant. Id. at 102. She also knew that the defendant was a black man and that the other defendant was Asian. Id. They were shackled together when she saw them in the courthouse. Although the Commonwealth had nothing to do with the witness’s seeing the defendant in this context, there is a shadow here of state action. In any case, the judge suppressed the identification and the Supreme Judicial Court affirmed that suppression because although there is not a constitu *480 tional basis, “[c]ommon law principles of fairness dictate that an unreliable identification arising from the especially subjective circumstances of this case should not be admitted.” Id. at 109. The court found important that the “encounter was not a casual confrontation in neutral surroundings,” and that the circumstances indicated that the prosecution thought that the defendant had been involved in a crime. Id. at 109-10. The court also determined that it was not the sort of case where cross examination and proper jury instructions could protect the defendant from an unreliable identification. Id. at 110.
Diaz’s identification is different. He knew Duarte before the day of the crime; he knew that he looked similar to the person that he first thought was on the bicycle that night; he knew that Duarte hung around with Ed. There was nothing “especially suggestive” in his friends telling him he was wrong as to whom he saw. He was free (and safer, probably) to reject their suggestions or refuse to identify anyone. It may be that the jury will find his identification is unreliable because he had originally identified someone else, he was not in a good enough position to see Duarte on this occasions, he identified Duarte because he already knew him or any number of other reasons. None of those reasons requires that this identification be suppressed either on constitutional or fairness grounds. Any unreliability in this identification may be fully explored on cross examination.
ORDER
For the above reasons, the court DENIES the Motion to Suppress the identification of Jose Duarte by Wendell Diaz.

 The Court was informed that the witness, Diaz, was afraid of retaliation if he testified. The testimony of Officer Keeler supported this report of Diaz’ fear. After hearing Officer Keeler and viewing the videotape, the Court was satisfied that there was no hint of any type of extreme pressure from third parties that would merit suppression of the identification and, therefore, determined it was unnecessary to hear from Diaz.