NOVA, COMMONWEALTH vs., 101 Mass. App. Ct. 1

 
 COMMONWEALTH vs. PAUL A. NOVA.

101 Mass. App. Ct. 1
 September 17, 2021 - April 25, 2022

Court Below: Superior Court, Norfolk County
Present: Rubin, Milkey, & Henry, JJ.

 

No. 20-P-753.

Controlled Substances. Evidence, Constructive possession, Consciousness of guilt. Practice, Criminal, Instructions to jury, Question by jury, Argument by prosecutor, Argument by counsel.

The evidence at the trial of an indictment charging the defendant with trafficking in heroin sufficed to support the jury's finding beyond a reasonable doubt that the defendant constructively possessed the heroin in question. [5-6]

At a criminal trial, the judge, when instructing the jury on consciousness of guilt, did not commit an abuse of discretion in stating that, if the jury believed a police officer's testimony about a hand movement made by the defendant, that testimony would have supported a reasonable, although not inescapable, inference that the defendant was attempting to hide heroin. [6-7]

There was no merit to a criminal defendant's contention that a trial judge's instructions to the jury with respect to joint possession, given in response to the jurors' questions, improperly allowed the jury to find the defendant guilty as a joint venturer. [7-8]

This court concluded that a statement by the prosecutor in closing argument at a criminal trial was a reasonable, though not inescapable, inference drawn 

 Page 2 

from the evidence, and the defendant's inability to rebut the argument was a consequence of the order of argument set out in the rules of criminal procedure. [8-9] Rubin, J., concurring.

A criminal defendant failed to demonstrate that certain statements made by the prosecutor in closing argument contained misstatements of the evidence and amounted to error; further, a final statement (to which trial counsel did not object) containing a clear but minor factual error did not create a substantial risk of a miscarriage of justice. [9-11]

INDICTMENT found and returned in the Superior Court Department on June 30, 2015. 

 The case was tried before Thomas A. Connors, J. 

 Anne O'Reilly for the defendant.

 Christine Billingsley, Assistant District Attorney, for the Commonwealth.

 RUBIN, J. The defendant, convicted of trafficking heroin weighing eighteen grams or more in in violation of G. L. c. 94C, § 32E (c) (1), raises claims concerning the sufficiency of the evidence, a jury instruction on consciousness of guilt, the judge's response to two jury questions, and several asserted errors in the prosecutor's closing argument. We find the evidence sufficient and no error in the jury instruction or the judge's response to the jurors' questions. As to the prosecutor's closing, we conclude that the defendant is correct as to one of his claims that the closing contained an erroneous factual assertion. We conclude that the one factual error we have identified in the prosecutor's closing -- a statement to which trial counsel did not object -- did not create a substantial risk of a miscarriage of justice, the standard by which we review unpreserved claims of error raised for the first time on appeal. Consequently, we affirm the judgment. 

 Background. On the evening of April 24, 2015, a Pontiac Grand Prix with two male occupants pulled over on the right-hand side of Roberts Street in Quincy. A man later identified as the defendant was observed walking in the direction of the Grand Prix. The front seat passenger opened the door, got out, and got back into the back seat of the two-door car. The defendant entered the passenger compartment, sat in the front passenger's seat, and closed the door. 

 The Grand Prix turned left onto Water Street, immediately turned left onto Grossman Street, immediately turned left onto South Junior Terrace, and then went back toward Roberts Street, on which it pulled over to the right-hand side of the road and dropped the defendant off. At trial, Detective Lieutenant John 

 Page 3 

Perchard of the Weymouth Police Department testified that based on his expertise with drug transactions, he concluded that this behavior, a so-called "meaningless ride," was indicative of drug-dealing activity.

 The defendant then walked toward Water Street, where he entered the passenger side of a White Ford Fusion, which the police determined, through querying its registration on a police computer, was a rental car. Detective Perchard testified that rental cars are often employed in street-level drug transactions through "rental rendezvous," where one party will "pull up to someone to conduct a drug transaction," sometimes through "meaningless rides" like the one just described. The police, believing they had witnessed the defendant engage in a drug transaction, stopped the Fusion on Washington Street. Meanwhile, other officers stopped the Grand Prix. During a subsequent search of the passenger of the Grand Prix, police found $147 and four small knotted baggies of white powder, later determined to be cocaine, in his left sock. 

 Officer Paul Foley, who had signaled for the Fusion to stop, approached the driver's side window and repeatedly told the operator of the Fusion, identified as Henry Dorvilus, to roll down his window. Dorvilus did not comply. 

 The officer attempted to open the driver's side door from outside, but it was locked. The officer observed Dorvilus to be looking around, turning his neck to the left and to the right, and concerned that Dorvilus would try to flee in the vehicle, and that he, the officer, might be struck by it, the officer drew his firearm and yelled for Dorvilus to unlock the door and put the car into park. Dorvilus did unlock the door. Detective Michael Powers arrived at the driver's side door and was able to open it after it had been unlocked. 

 Once the driver's side door was open, the detective removed Dorvilus from the car, and Officer Foley unlocked the passenger's side door, using the switch on the driver's side door, for Detective William O'Brien, who was on the passenger's side of the vehicle. 

 Detective O'Brien had approached the passenger's side of the Fusion before the driver's side door was opened. Upon his arrival, he observed the defendant in the front passenger seat, with his head turned toward the driver, Dorvilus. There were two cup holders in the center console of the Fusion. Detective O'Brien observed in the passenger's side cup holder a medium-sized knotted bag that had a white substance in it, later determined to be heroin, the net weight of which, without packaging, was 19.99 grams. 

 Page 4 

 The detective, seeing the heroin, attempted to open the passenger's side door, which at this point was locked, and yelled, "There it is. Open the door. Open the door." The defendant turned, made eye contact with Detective O'Brien, and then lifted his left hand, palm up, placing it in the detective's line of sight to the bag of heroin in the cup holder. Detective O'Brien gave the defendant commands to open the passenger's side door, and as Detective O'Brien moved his head, the defendant moved his hand in what the jury could have found was an attempt continuously to prevent the detective from seeing the bag of heroin in the cup holder. 

 Once the passenger's side door was unlocked from the driver's side, Detective O'Brien opened it, ordered the defendant to place his hands on the ceiling of the motor vehicle, and removed the bag of heroin from the passenger's side cup holder. The defendant ultimately was searched. Three folds of money were discovered on his person totaling $1,542. Six hundred and twenty dollars was in his right sock, and two folds of $580 and $342, respectively, were in his pants pocket. The Fusion, too, was searched, and four cell phones were recovered from the passenger compartment. One of them, a small flip phone, continuously rang once retrieved from the Fusion.

 Based on the apparent drug deal in the Grand Prix and the heroin found in the Fusion, the defendant was charged with distribution of cocaine, in violation of G. L. c. 94C, § 32A (c); trafficking heroin with a net weight of eighteen grams or more, in violation of G. L. c. 94C, § 32E (c) (1); drug violation near a school or park, in violation of G. L. c. 94C, § 32J; two counts of conspiracy to violate the drug law, in violation of G. L. c. 94C, § 40; distribution of cocaine, subsequent offense, in violation of G. L. c. 94C, § 32A (d); and distribution of a class A drug, subsequent offense, in violation of G. L. c. 94C, § 32 (b). Prior to trial, the trial judge allowed the defendant's motion to dismiss the two counts of conspiracy to violate drug law and the school zone counts.

 At trial, Detective Lieutenant Perchard provided expert testimony that drug dealers generally carry money on their person in different folds from different transactions. Perchard testified that keeping money in different folds allows for a quick transaction, and allows the drug dealer to maintain records of who paid him and how much he was paid. He also testified that cell phones are a common tool used to facilitate communication between buyers and sellers of drugs and that drug dealers frequently have more than one cell phone to conduct their drug-dealing business.

 Page 5 

 The defendant was acquitted of distribution of cocaine and convicted of trafficking heroin weighing eighteen grams or more. The Commonwealth chose not to go forward on the subsequent offense enhancement relevant to the heroin charge. The defendant now appeals his conviction. 

 Discussion. 1. Sufficiency of the evidence. The jury were instructed on both actual and constructive possession with respect to the possession element of the trafficking offense. It is undisputed that the defendant did not actually possess the heroin, and the defendant's first argument is that the evidence was not sufficient to find that he constructively possessed the heroin found in the Fusion's center console.

 Constructive possession is proven by "evidence that the defendant had both knowledge of the contraband and the ability and intention to exercise dominion and control over it." Commonwealth v. Ortega, 441 Mass. 170, 174 (2004). The defendant asserts correctly that mere presence is not enough to support an inference of possession, but that a "plus factor," namely other incriminating evidence, when combined with presence may suffice. Commonwealth v. Velasquez, 48 Mass. App. Ct. 147, 149 (1999). 

 The evidence in this case is plainly sufficient to support the conviction. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979) (in reviewing denials of motion for required finding, appellate court views evidence in light most favorable to Commonwealth to determine whether any rational trier of fact could find essential elements of offense beyond reasonable doubt). The defendant was the person in the passenger compartment in closest proximity to the drugs, which were in the cup holder adjacent to his, rather than the driver's, seat. In addition, he had, immediately prior to his arrest, engaged in what the jury could have found to have been a drug deal -- even despite his acquittal of distribution of cocaine. See Commonwealth v. Gonzalez, 452 Mass. 142, 150 (2008) ("Our rule is well settled that, in cases tried before a jury, mere inconsistency in verdicts, one of which is an acquittal, will not render the verdict of guilty erroneous" [quotation and citation omitted]). The defendant also had in his pockets folds of money consistent with being a seller of narcotics. Further, the jury could have found that he attempted to hide the heroin from the view of the officer who had approached the passenger's side door and that he ignored the officer's commands to open his door. The facts and circumstances of this case suffice to support the jury finding beyond a reasonable doubt that the defendant constructively possessed 

 Page 6 

the heroin. 

 2. Consciousness of guilt instruction. The defendant objected to the judge giving a consciousness of guilt instruction based on the defendant's attempt to use his hand to hide the heroin from Detective O'Brien's view. The judge instructed the jury as follows:

 "[I]t's alleged that that defendant . . . placed his hand over an item, which the government is alleging . . . were illegal narcotics in an effort to shield it, and that he moved his hand during the time that one of the police officers was looking in the window. . . .

 "If the Commonwealth has proven . . . this conduct . . . you may consider whether such actions on [the defendant's] part indicated feelings of guilt, and whether, in turn, such feelings of guilt reflect actual guilt in the charge in this case. . . .

 "If you decide that such inferences are reasonable, it's going to be up to you to decide how much importance to give them. However, you should always remember there may be numerous reasons that an innocent person might do such things. Such conduct does not necessarily reflect feelings of guilt. And, please also bear in mind that a person having feelings of guilt isn't necessarily guilty. . . . In fact, because such feelings are sometimes found in innocent persons.

 "Finally, please be aware . . . such evidence is not enough to convict a person of a crime. You may not find the defendant guilty on such evidence alone, but you may consider it in your deliberations along with all of the other evidence in the case as to whether or not it does reflect actual guilt on the defendant's part. . . ." 

 The defendant argues that the evidence of the defendant's hand movement was not adequate to support the consciousness of guilt instruction because the hand gesture was "ambiguous." Attempting to hide contraband, however, may well reflect consciousness of guilt, and we see no abuse of discretion in the judge's determination that, if the jury believed the testimony of the officer about the hand movement made by the defendant, that testimony would have supported a reasonable, although not inescapable, inference that the defendant was attempting to hide the heroin. See Commonwealth v. Stuckich, 450 Mass. 449, 453 (2008) ("Consciousness 

 Page 7 

of guilt instructions are permissible when there is an 'inference of guilt that may be drawn from evidence of flight, concealment, or similar acts'" [citation omitted]). 

 3. Jury question. The defendant next argues that an unobjected-to answer given by the judge to a question from the jury created a substantial risk of a miscarriage of justice. On the first day of deliberations, the jury submitted a question to the judge which read, "If he knew that it was heroin in the baggie, does it automatically mean he had constructive possession?" The judge correctly answered, "Jurors, the answer to the question, essentially, is no." The judge reinstructed on possession, actual and constructive, including the statement, "And, again, possession, whether actual or constructive, need not be exclusive. It may be shared." He then went on, "[T]he short answer to this question is no, it does not automatically mean at all . . . that the person has constructive possession."

 The next day, as deliberations continued, the jury asked, "Could you please give us more examples of joint constructive possession? Can you give an example of indirect knowledge and intent and/or ability to control?"

 The judge instructed, 

 "So, jurors, with respect to your question, I want to state to you that the government may prove possession that is . . . actual or constructive. I also want to mention to you that the possession need not be exclusive. It may be joint. In this case, there is an allegation [that] there were two persons in the car. The government has no burden to prove [that] there was joint possession by them, and if Mr. Dorvilus were the possessor of an item, exclusively, and [the defendant] did not meet this definition, he would have to be acquitted. However, there may be joint possession. It's for you to decide on . . . all the facts of this case.

 "But I want to let you know that there is really no such thing as indirect knowledge. It has to be this defendant's knowledge. So, again, so it's clear, his possession alleged need not be exclusive with [the defendant]. It could be shared. However, his knowledge . . . of the item and his . . . his possession of it, his constructive possession, must be his own. He would have to be constructively possessing it, not just aware it was present, whether it was possessed by someone else or not. It has to be his own personal possession, but that possession 

 Page 8 

need not be exclusive and that possession may be actual or it may be constructive."

 The defendant argues that this instruction allowed the jury to find the defendant guilty as a joint venturer, a theory that was not consistent with the Commonwealth's evidence and that was neither charged nor argued. We disagree. As the Commonwealth points out, "[a] finding of joint venture is not a precondition for a finding of joint possession." Commonwealth v. Fernandez, 48 Mass. App. Ct. 530, 534 (2000). We see no error in the judge's instruction with respect to joint possession given in response to the jurors' questions, and we note that it was consistent with the judge's original instructions. 

 4. Closing argument. a. Preserved claim of error. The defendant raises several objections to aspects of the prosecutor's closing argument. 

 First, the prosecutor made several references to the cell phones found in the Ford Fusion, telling the jury, 

 "[T]his case is as simple as the defendant's ringing flip phone that continuously rang shortly after 7:20 P.M. on that Friday night, April 24th, 2015. . . .

 ". . .

 "So, this defendant, in a rental vehicle, has his driver travel to his next destination to distribute 19.99 grams of heroin by using his blowing-up flip phone.

 ". . .

 "There's four cell phones in that car. Does it matter where they're located? No. There's four cell phones in that car." 

 Trial counsel objected to "[t]he argument [that] the defendant's cell phone was blowing up," and the defendant argues before us that there was no evidence to support that any of the cell phones found in the Fusion belonged to the defendant. He notes that, under the Massachusetts Rules of Criminal Procedure, because the defendant argues first, he was unable to rebut the claim that the ringing cell phone belonged to him. See Mass. R. Crim P. 24, 378 Mass. 895 (1979). Trial counsel, in the defendant's view, did not have an opportunity to tell the jury that there was no evidence that the cell phones belonged to the defendant, as he had already given his closing argument.

 Page 9 

 We do not think the defendant's objection was well taken. It was a reasonable, though not inescapable, inference drawn by the prosecutor that the continuously ringing cell phone belonged to the defendant. The fact that it was one of many cell phones in a car with only two people in it, and that it was ringing continuously, supported an inference that it belonged to a drug dealer, and the defendant's behavior with respect to the Grand Prix and its occupants supported an inference that he was a drug dealer. The Commonwealth is entitled to argue reasonable inferences from the evidence. See Commonwealth v. Andrews, 427 Mass. 434, 440 (1998). To be sure, the defendant was not able to rebut the Commonwealth's argument, but that is a consequence of the order of argument set out in the Mass. R. Crim. P. 24, something that has been upheld by this court. See Commonwealth v. Seminara, 20 Mass. App. Ct. 789, 799 (1985).

 b. Unpreserved claims of error. The defendant also challenges three other statements made by the prosecutor in closing. As there was no contemporaneous objection to these statements, our review is to determine whether there was error, and, if so, whether it created a substantial risk of a miscarriage of justice. See Commonwealth v. Grandison, 433 Mass. 135, 141-142 (2001). 

 To understand these claims, one must be aware of two aspects of defense counsel's closing. First, in defense counsel's closing, he said that neither while the defendant was being observed in the Grand Prix, nor after he got out of the car, was the defendant seen retrieving something from, or putting something in, his sock or his pants. 

 Second, as to the hand gesture the defendant was alleged to have made, defense counsel said, "If [the defendant] really was trying to hide those drugs . . . [he] would've leaned over, [he] would've grabbed them, and [he] would've tucked them down between the center console of the seat." Defense counsel continued, "If [the defendant] really, really wanted to hide or conceal whatever was in that center console . . . [i]t's absurd. He would've put his hand over it. He would've put his body in [sic] it. He would've tried to hide it. No one's going to try with a hand to follow the line of sight. It's implausible. It's not believable, especially in the context of the presumption of innocence."

 In his closing, the prosecutor said, 

 "You don't think the defendant could've slipped something in out [sic] of his sock or pocket? No one's saying he's 

 Page 10 

bright. No one's saying he's the smartest person in the room. No one's saying he should've done a better job of hiding the heroin, except for his counsel."

 ". . .

 "The evidence shows that this defendant is directing this driver to get out of there, because he knows he's in actual and constructive possession of 19.99 grams of heroin, and his customers are waiting for him."

 ". . .

 "Nobody saw the defendant reach to his sock. How do you think it got there? The tooth fairy? Nobody saw the defendant reach to his sock. Clearly, he did, because he's got money in his sock . . . ."

The defendant avers that these statements contain misstatements of the evidence, and they amounted to error.

 Turning first to the statements about the defendant reaching to his socks or his pockets, we disagree. Although it is not completely clear to what time frame the prosecutor was referring in the first paragraph quoted above, it is clear that he was arguing that the jury should draw the reasonable inference with respect to the charge of distribution of cocaine that, even though there was no testimony of an observation of the defendant placing money or retrieving something from his sock, he must have done so, since after his meaningless ride, there were drugs in the Grand Prix and money in his sock. Of course this is not an inescapable inference. The money could have been in his sock before he entered the Grand Prix and may have remained there throughout, but again, the Commonwealth is permitted to argue reasonable inferences. 

 In any event, even if the statement were error, we would find no substantial risk of a miscarriage of justice, since the defendant subsequently was acquitted of the offense with respect to the Grand Prix, the alleged crime to which the prosecutor was referring.

 The defendant also complains that the first quotation contains an attack on the intelligence of the defendant. We think the two sentences that refer to the defendant not being "bright," or "the smartest person in the room," are actually a fair response to the argument put forward by defense counsel that if the defendant had truly intended to hide the heroin, he would have utilized a 

 Page 11 

means more efficacious than moving his hand with palm turned up in an attempt to block the officer's line of sight. Of course, assuming the defendant was trying to hide the heroin with this hand motion, it may not have been lack of intelligence that led him to utilize a method like this that was very unlikely to succeed, but simply a circumstance in which he reasonably calculated that the cost of any more obvious attempt to hide the heroin would outweigh the marginally increased benefit in terms of likelihood of success. Nonetheless, the rhetorical approach used by the prosecutor does not seem to us in context to go beyond the bounds of permissible argument. 

 By contrast, the final sentence of that first paragraph, in which the prosecutor mischaracterized defense counsel's argument that it was implausible that the defendant would have used his hand in the way described if he was attempting to hide the heroin, suggesting it amounted to an admission of guilt coupled with an expression of disappointment that the defendant had not been more successful in hiding it, does strike us as impermissible argument. Nonetheless, we do not think the jury actually could have been misled by it into thinking that defense counsel expressed a wish that his client had done a better job of hiding the heroin. We therefore find no substantial risk of a miscarriage of justice.

 Finally, as noted, in closing the prosecutor said that "[t]he evidence shows that this defendant is directing this driver to get out of there, because he knows he's in actual and constructive possession of 19.99 grams of heroin, and his customers are waiting for him." The defendant is correct that this was a clear misstatement of the evidence. There was no evidence of the defendant saying anything at all to the driver, let alone directing him to drive away in the face of police orders to open the door of the car. The argument therefore was not supported by the evidence.

 Nonetheless, in the context of the case and the entire closing, including the judge's instruction that the jurors' memory of the evidence controls, we conclude that this relatively minor error did not create a substantial risk of a miscarriage of justice. Consequently, the judgment is affirmed.

 So ordered.

 RUBIN, J. (concurring). I write separately because, in noting that a defendant has under the Massachusetts Rules of Criminal Procedure 

 Page 12 

no opportunity to respond to arguments made by the prosecutor to which he or she objects, the defendant has touched on an issue that arises in many of our cases and that, I believe, warrants a reexamination of the procedure our courts currently employ for closing argument.

 Rule 24 of the Massachusetts Rules of Criminal Procedure, 378 Mass. 895 (1978), states that "the defendant shall present his closing argument first," and it provides for no rebuttal. Having heard many appellate cases over more than a decade that address closing argument by the Commonwealth, I have come to believe that it would be appropriate to reconsider our rule, adopted almost fifty years ago, and to replace it with a procedure that allows the defendant to respond to the government's closing.

 This might take the form of the Federal rule. For over forty-five years, it has provided that "[c]losing arguments proceed in the following order: (a) the government argues; (b) the defense argues; and (c) the government rebuts." Fed. R. Crim. P. 29.1 (2021). Or it might take the form of retaining our current rule and simply allowing rebuttal. Doubtless there are pros and cons to the various forms closing argument might take, [Note Rubin-1] and the stakeholders, and particularly members of the criminal bar, will have important insights into what will work best and be most consistent with due process, the proper functioning of our adversary system, and the liberty-protective values of our constitutional system. But allowing the defendant to respond to the government's closing argument seems to me essential for at least two reasons.

 First, permitting a response to the government would increase confidence in our system of criminal justice. In the great majority of cases in which a defendant has identified an error by the prosecutor in closing argument, we conclude -- as we do today -- that the error in closing does not warrant reversal. If response to the government's closing were permitted, the convictions of the criminal defendants in these cases would not depend on a panel of appellate judges, who were not in the jury room, reaching a conclusion by hypothesizing about what would have happened in that room had the errors not occurred -- something about which we can never be absolutely certain, but which is, in essence, what we have done today, and what we do in so many 

 Page 13 

cases where we affirm convictions despite errors in the Commonwealth's closing. Instead, the defendants' convictions would come only after the juries themselves, having heard those claimed errors addressed by defendant's own counsel, nonetheless voted unanimously for conviction. This would be far more desirable. Not only might it serve the cause of judicial economy, it would enhance the confidence of the public, and of individual defendants, in the decisions reached by our criminal justice system.

 Second, and more fundamentally, there are powerful arguments with respect to the protection of the liberty of those accused of crime that militate in favor of adopting a procedure where the defendant is able to respond to the government's closing. Under our current rule 24, defense counsel are routinely faced with the circumstance of proper but unanticipated closing arguments by the Commonwealth, to which they may not provide a response even if they have a perfect one.

 As Judge Wilkinson recently wrote in an opinion for the United States Court of Appeals for the Fourth Circuit, the "purpose" of allowing the defendant to respond to the government under Fed. R. Crim. P. 29.1 "is to preserve a defendant's final opportunity to respond to the prosecution's case in an informed manner." United States v. Smith, 962 F.3d 755, 770 (4th Cir.), cert. denied, 141 S. Ct. 930 (2020). Indeed, in that case, where the court held that it was an abuse of discretion under the Federal rule for the government to waive closing argument but to be allowed to rebut defendant's closing argument -- that is, where the government closed second with no rebuttal by the defendant, as our rule always requires -- the court found that leaving the defendant "with no opportunity . . . to meaningfully respond to what the government has said" was a "perverse result." Id. As Judge Wilkinson wrote, "'[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' . . . '[N]o aspect of such advocacy could be more important than' what is at issue here -- 'the opportunity finally to marshal the evidence for each side before submission of the case to judgment.'" Id., quoting Herring v. New York, 422 U.S. 853, 862 (1975). 

 The court in Smith concluded that when no response to the government is possible, "it has the effect of 'sandbag[ging]' the defendant by setting him up to avoid a subject in his closing argument, only to learn that it is too late to reply to the prosecution's 

 Page 14 

side of the story." Smith, 962 F.3d at 770. But even when there is no question of sandbagging, as there ordinarily is not, we routinely see cases where the Commonwealth has chosen to emphasize facts and make arguments that are not anticipated by defense counsel, and therefore that are not addressed in the defendant's own closing argument. This is not the way our adversary system is supposed to work.

 The problem that I describe is well known to defense counsel in our courts, some of whom have taken to asking the jurors to imagine defense counsel is with them in the jury room, to imagine what he or she might say in response to the government's argument -- something jurors are of course utterly ill-equipped to do -- because defense counsel will be unable to provide a response themselves.

 We are of course bound by the prior decision of this court in Commonwealth v. Seminara, 20 Mass. App. Ct. 789, 799 (1985), that held, though without substantial analysis, that our rule 24 does not violate principles of due process -- a question on which the Supreme Judicial Court has not had the opportunity to opine. See id. ("[a]s a matter of common sense, the order of argument does not rise to a question of constitutional dimension"). Nonetheless, the constant stream of criminal cases before us in which we are faced with errors in the Commonwealth's closing to which the defendant has not had a chance to respond in front of the jury, and arguments by the Commonwealth that the defendant has failed to anticipate, has persuaded me of the correctness of the words of the Federal Advisory Committee on Criminal Rules that the "fair and effective administration of justice [would] best [be] served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to reply." See Fed. R. Crim. P. 29.1 advisory committee note.

 Consequently, I believe it would be appropriate to reexamine and reconsider our rule 24, and to adopt a procedure for closing argument that allows defendants an opportunity to respond to the arguments put forward by the government in its closing.

FOOTNOTES
[Note Rubin-1] See, e.g., Mitchell, Why Should the Prosecutor Get the Last Word? 27 Am. J. Crim. L. 139, 143 (2000) (arguing that allowing rebuttal by the prosecution where it argues first in closing is inconsistent with a system designed to "protect[] the defendant against overreaching governmental power"). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.