## COMMONWEALTH *vs.* JOHN F. SILANSKAS.

Plymouth. December 5, 2000. - April 13, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Practice, Criminal,* Admissions and confessions, Voluntariness of confession, Waiver, Instructions to jury, Voluntariness of statement, Argument by prosecutor, Reasonable doubt, Capital case. *Evidence,* Admissions and confessions, Joint enterprise, Hearsay, State of mind, Relevancy and materiality, Inference. *Intoxication. Joint Enterprise. Homicide.*

The record of a hearing on a motion to suppress evidence supported the judge's conclusion that the defendant was rational and coherent when he was questioned by police and that he knowingly and intelligently waived his Miranda rights both at his home [685-686] and later at the police station [686-688].

At a murder trial, the evidence was sufficient to warrant the judge's instruction to the jury on the theory of joint venture as well as principal liability [689-692], and statements of a joint venturer made during the cooperative effort and in furtherance of its goal were properly admitted in evidence [692-693], and in any event, the statements were independently admissible [693-695].

A criminal defendant was not entitled to raise for the first time on appeal the issue of the voluntariness of his statements to a newspaper reporter [695-696], and no substantial likelihood of a miscarriage of justice arose from the judge's not conducting a voir dire during trial on voluntariness where no such issue was presented [696-697].

The protections of the Fifth and Sixth Amendments to the United States Constitution did not extend to conversations between a criminal defendant and a private citizen who was not acting on behalf of the Commonwealth, and art. 12 of the Massachusetts Declaration of Rights likewise did not apply. [697]

At a murder trial in which the defendant claimed the victim committed suicide, evidence of statements made by the victim to a priest were admissible to prove the victim's state of mind immediately preceding his death. [697-698]

Where it could be inferred from the evidence at a murder trial that the victim's hands had been tied, the prosecutor had a proper basis to cross-examine the defendant's expert pathologist on that inference. [698-699]

At a murder trial, the prosecutor did not shift the burden of proof by certain remarks in closing argument [699-700]; an improper comment on excluded evidence was cured by the judge's careful and thorough instructions on the subject [700-702]; an improper remark about the length of defense counsel's closing argument could not have had an impact on the verdict

[702-703]; and the combined effect of improprieties did not constitute reversible error [703].

In a murder case, the judge's instructions on reasonable doubt and the presumption of innocence were correct and sufficient. [703-705]

INDICTMENT found and returned in the Superior Court Department on January 22, 1996.

A pretrial motion to suppress evidence was heard by *John A. Tierney*, J., and the case was tried before *Charles J. Hely*, J.

*Matthew A. Kamholtz* for the defendant.

*Mary E. Lee*, Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted of murder in the first degree based on extreme atrocity or cruelty.[1] On appeal, he claims that (1) statements he made to the police were obtained in violation of his Miranda rights and thus improperly admitted; (2) the evidence did not support a theory of joint venture; (3) statements he made to a newspaper reporter while he was in custody were improperly admitted because (a) they were not voluntary; and (b) they should not have been admitted without a voir dire; (4) hearsay statements of the victim to Father John Bacon were improperly admitted; (5) the Commonwealth improperly cross-examined a defense pathologist by basing questions on facts not in evidence; (6) the prosecutor's closing argument was improper; and (7) the judge's instructions regarding reasonable doubt were flawed. The defendant also asks that we exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial. We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* We set forth the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with specific issues raised. On the night of January 8, 1996, Brockton police discovered the body of David Crowninshield (David) in a freezer in the basement of his home. David had been severely beaten and suffered a fractured jaw, nose,

---

[1] The victim's wife, Lillian Crowninshield (Lillian), was convicted at an earlier trial of being an accessory after the fact to murder. The Appeals Court affirmed her conviction. *Commonwealth* v. *Crowninshield*, 46 Mass. App. Ct. 1122 (1999).

sternum, and several broken ribs. He also had bruises and cuts on his face, neck, arms, and hands and a deep cut on each wrist that severed the underlying artery. He had an abrasion on his back that occurred after he was dead; the appearance of the abrasion suggested that his body had been dragged. The cause of death was blood loss.

On December 29, 1995, Lillian, David's wife, and the defendant were eating lunch at a local café. Lillian told a waitress that she was engaged to the defendant and would be marrying him on Valentine's Day. She explained that David had recently left to join a monastery in Maine, but that a divorce would not be a problem because the defendant "knew lawyers." After Lillian's credit card was declined, the defendant left to get money for the bill but never returned. The waitress reported the unpaid bill to Officer Dominic Persampieri of the Brockton police department.

Officer Persampieri spoke with Lillian on January 3, 1996, at her home. He asked if her husband were there, and Lillian stated that he was upstairs and called for the defendant by his nickname. After Officer Persampieri determined that the defendant was not Lillian's husband, both Lillian and the defendant explained to the officer that David had moved to Canada to join a monastery.

On January 7, 1996, Countee Gilliam, an acquaintance of the defendant, went to the Crowninshield home to look at a train set that was for sale. While there, the defendant showed him the body in the freezer. Lillian told Gilliam that David deserved to die because he had raped her daughter. She said that she gave David a knife and he cut his wrists. According to Lillian, she and the defendant watched David bleed to death in the living room, and the defendant later put the body in the basement freezer. When Gilliam told Lillian and the defendant that they had to "do something" about the situation, the defendant said that he was going "to turn himself in." The next day the defendant admitted to Gilliam that he had beaten David but denied killing him. He told Gilliam that Lillian paid him $5,000 to "get rid of" David. Gilliam reported these events to police that night.

Upon arriving at the Crowninshield home on January 8, 1996,

Officers Persampieri and Thomas Spillane and Sergeant Richard Cudworth found Lillian and the defendant inside. Officer Persampieri read them Miranda warnings, and they agreed to let the officers search the basement. There, the police found David's body. They questioned Lillian and the defendant, placed them under arrest for murder, and transported them to the Brockton police station. The defendant made statements to the police both at the house and at the station.[2]

Pursuant to a search warrant, the police conducted a full search of the house. They tested for blood and found blood-stains throughout the house. They seized several items from the basement including a bloody utility knife; a plastic garbage bag containing a sponge mop head, fifteen to eighteen pieces of blood-soaked rope, and a plaid shirt; and a pair of blood-stained blue jeans hidden under the garbage bag. They also seized from one of the bedrooms a pair of black jeans the defendant had been wearing when David died.

Certain bloodstains on the knife, the plaid shirt, the blue jeans, and the black jeans were all consistent with David's blood type. The plaid shirt was bloodied on the upper sleeve and inside the cuffs. The stains on the blue jeans were concentrated along the back left side in a pattern suggesting that the person was standing as blood flowed down onto the back of the pants.

David had spoken with Father John Bacon by telephone on December 26, 1995, the day he died. David stated that Lillian had come under a "bad influence" and he was going to divorce her, that his life was being threatened and he was going to find a safe place where he could call Father Bacon again.

On January 21 and 28, 1996, a newspaper reporter who was previously acquainted with the defendant interviewed him while he was in custody at the Plymouth County house of correction. The defendant told the reporter that he and David had fought, that he left the house when Lillian said she was leaving David and David said he was going to kill himself, and that when he returned, David was in the basement and had two slit wrists. The defendant stated that David was still alive at this time, but

---

[2]The substance of these statements is detailed in Part 2, infra.

that when he checked on David two hours later, David was dead. The defendant hid the body in the freezer, afraid the police would not believe what had happened. The defendant denied any romantic involvement with Lillian. The defendant also stated that an unnamed third person had been in the house, and he blamed this person for killing David. The defendant told the reporter he would be getting a teardrop tattooed under his eye. The reporter asked the defendant if he knew that such a tattoo meant that he killed someone, and the defendant answered, "Yes, I do."

While Lillian and the defendant were in custody pending trial, the defendant wrote letters to Lillian. He told her that he loved her and implicated a third person (Steve) in David's death. He wrote that he had hit David, but then left the house.

2. *The defendant's statements.* We recite the relevant facts found by the judge on the defendant's motion to suppress his statements to the police, with minor additions from uncontested testimony from the transcript of the hearing. When the Brockton police officers arrived at the Crowninshield residence, they read the Miranda warnings to the defendant and Lillian. After the police discovered David's body, Officer Spillane took the defendant into the kitchen to question him and advised the defendant of his Miranda rights again. The defendant stated both times that he understood his rights. The defendant told the police that Lillian hired him to beat David, which he did; that David wanted to commit suicide because Lillian was going to leave him; and that at David's request Lillian brought him a knife; and that David cut himself, including his wrists. The defendant demonstrated how David hacked at, rather than sliced, his wrists. The defendant explained that he took David to the basement at Lillian's request, had second thoughts, however, and wanted to telephone an ambulance, but Lillian had locked the basement door; David then bled to death in the basement and he put David in the freezer after Lillian offered him money to do so.

Officer Spillane noticed an odor of alcohol on the defendant's breath, and the defendant repeatedly asked for a beer. The officer believed that the defendant was under the influence of alcohol but "not to the point where he couldn't understand

what I was saying, and he was talking fluently to me." The defendant did not have difficulty walking or communicating, and his answers to questions were appropriate. During the questioning, the defendant mentioned the name of his attorney and recited the attorney's telephone number, but when Officer Spillane asked the defendant if he wanted to telephone his attorney, the defendant said no.

The officers handcuffed Lillian and the defendant and drove them to the Brockton police station. When they arrived at the station, Officer Persampieri informed the defendant that he was not under arrest,[3] but that the case was still under investigation. Officer Spillane questioned the defendant further at the station. The defendant repeated essentially the same story, but added that another person was involved and that Lillian had paid this other person who "was more involved than [the officer] knew." The defendant mentioned that he had telephoned his attorney earlier in the day. Officer Spillane again asked him whether he wanted to contact his attorney, and the defendant said no.

Trooper William Barrett of the State police and Detective Manuel Gomes of the Brockton police department questioned the defendant at the station (Barrett-Gomes interview). This interview took place one hour after the defendant initially had been advised of his rights.[4] Before it began, Detective Gomes asked the defendant if he had been advised of his rights and if he wished to speak to the police, and the defendant responded affirmatively. Trooper Barrett then asked the defendant if he was under the influence of drugs or alcohol. The defendant

---

[3]The motion judge found that, once the officers saw the body, the defendant was not free to leave. The discrepancy regarding the defendant's status is considered *infra*.

[4]The motion judge found that the police arrived at the house at 9 P.M. and that the time of the Barrett-Gomes interview was 10 P.M. This time sequence appears incorrect. The only testimony about the time of the Barrett-Gomes interview is from Trooper Barrett who testified that he and Gomes interviewed the defendant at about 10:30 or 11 P.M., i.e., about one and one-half hours after the defendant had been advised of his rights. The difference is not critical to our resolution of this issue as the time disparity does not affect the validity of the judge's conclusion. "[M]isstatements in the judge's findings of fact not essential to his ultimate conclusions will not invalidate findings which are supported by subsidiary facts." *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 368 (1997).

answered that he had had a few drinks but was not drunk. The defendant proceeded to tell the detectives essentially the same story regarding David's death that he had earlier told Officer Spillane at the station, but this time the other man, named Steve Andrews, played a larger role. During this interview, the defendant asked three times if he were under arrest and each time Barrett replied that he was not.[5,6]

About 4:30 A.M., the defendant telephoned his attorney. One of the State troopers spoke with the attorney and informed him that the defendant was not under arrest. Another officer overheard the defendant tell his attorney that he beat David but did not kill him. The officer reported the statement to his supervisor and then placed the defendant under arrest for assault and battery after the defendant completed the telephone call. At 4:59 A.M., the defendant was booked for murder and read his Miranda rights again.

About one hour later, at about 6:15 A.M., the defendant asked to speak with Trooper Barrett and Detective Gomes. At about 6:50 A.M., the officers advised him of his Miranda rights, and the defendant signed a form indicating his willingness to speak to the police. The defendant explained that after the fight, David went down to the basement on his own; Lillian bathed David and changed his clothes; he and Lillian put David in his bed, but changed their minds and brought David back to the basement. They later went down to the basement and found David dead with blood on the floor and they both put David in the freezer.

At the conclusion of the hearing, the judge denied the defendant's motion, except in one respect.[7] The defendant contends that the judge erred in failing to suppress his state-

---

[5]The motion judge found that Trooper Barrett was under the impression that the defendant had come to the station voluntarily and that he was not under arrest.

[6]In a separate interview, Lillian had told the police that the defendant had not meant to kill David.

[7]The judge suppressed the statements overheard while the defendant was speaking to his attorney. The judge found that, in regard to the telephone call, the police had failed to "respect the sanctity of the attorney-client privilege and the defendant's Sixth Amendment [to the United States Constitution] rights."

ments to the police. He claims that, although the Miranda rights were given before he made his initial statement at the house, his intoxication prevented a valid waiver of these rights. He also claims that he did not validly waive his Miranda rights later at the police station when he made further statements.

a. *Standard of review.* In reviewing a judge's determination regarding a knowing waiver of Miranda rights and voluntariness, we "accept[] the judge's subsidiary findings of fact absent clear error, give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found." Commonwealth v. Mello, 420 Mass. 375, 381 n.8 (1995).

b. *Voluntariness of waiver at house.* The defendant argues that his intoxication precludes a conclusion that he voluntarily and knowingly waived the constitutional rights protected by the Miranda warnings in his conversation with Spillane in the kitchen.[8] Miranda warnings are required when an interrogation is custodial. Commonwealth v. Larkin, 429 Mass. 426, 432 (1999), quoting Illinois v. Perkins, 496 U.S. 292, 297 (1990). The Commonwealth bears the burden of proving beyond a reasonable doubt that any waiver of Miranda rights was valid. Id. at 438, and cases cited. "To ensure that the defendant['s] statements were freely given and voluntary, the judge must examine the totality of the relevant circumstances, including the evidence of the defendant['s] conduct, [his] physical and mental condition[], and the details of the interrogation[]." Commonwealth v. Parker, 402 Mass. 333, 340 (1988), S.C., 412 Mass. 353 (1992), and 420 Mass. 242 (1995). "Special care must be taken in assessing a waiver and the voluntariness of the statements where there is evidence that the defendant was under the influence of alcohol or drugs. An otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs." Commonwealth v. Shipps, 399 Mass. 820, 826 (1987).

The circumstances surrounding the defendant's statements support the judge's finding that the waiver was valid. Officer

[8]There is no dispute that the Miranda warnings were given to the defendant twice at the house.

Spillane testified that during the conversation in the kitchen, although he detected an odor of alcohol on the defendant's breath and he noted that the defendant was under the influence of alcohol, the defendant's answers to the inquiries made of him were responsive, coherent, and, as the motion judge described them, "quite self-serving." The defendant could understand the officer's inquiries and communicate appropriately. The defendant indicated that he had an attorney and even provided Spillane with that attorney's telephone number, although he also said that he did not wish to contact him. The defendant recited a relatively complex series of facts and at one point demonstrated how the victim had cut his own wrists and face. These activities require a fairly high degree of concentration and memory. The evidence warrants the judge's conclusion that the defendant was "rational and coherent at the time of questioning, that [he] did understand the rights he was waiving and that such waiver was voluntarily made."

c. *Voluntariness of waiver at police station.* The defendant next argues that his intoxication and the various actions by the police prevented him from validly waiving his Miranda rights at the Brockton police station. Specifically, he claims that he did not voluntarily and knowingly waive his constitutional rights because he was not read the Miranda warnings again at the station or asked whether he wished to continue with his waiver until nine hours after the original arrest; he was never advised of his right to terminate the questioning; and the police lied and manipulated the situation.

As to the lack of Miranda warnings at the police station, Officer Spillane asked the defendant at the station once again if he wished to telephone his attorney and the defendant declined. Detective Gomes asked the defendant if he had previously been given the Miranda warnings and if he wished to speak to the police. After the defendant responded affirmatively to both inquiries, he was interviewed again, this time by Trooper Barrett and Detective Gomes. This second interview occurred about one and one-half to two hours[9] after the defendant had been twice advised of his rights. "Miranda warnings, once given, are not to be accorded unlimited efficacy or perpetuity." *Com-*

---

[9]See note 4, *supra.*

*monwealth* v. *Cruz*, 373 Mass. 676, 687 (1977), quoting *United States* v. *Hopkins*, 433 F.2d 1041, 1045 (5th Cir. 1970), cert. denied, 401 U.S. 1013 (1971). "However, 'there is no requirement that an accused be continually reminded of his rights once he has intelligently waived them.' " *Commonwealth* v. *Mello*, 420 Mass. 375, 385-386 (1995), quoting *Biddy* v. *Diamond*, 516 F.2d 118, 122 (5th Cir. 1975), cert. denied, 425 U.S. 950 (1976), quoting *United States* v. *Anthony*, 474 F.2d 770, 773 (5th Cir. 1973). "Generally, where there has been a significant lapse of time between initial Miranda warnings and inculpatory statements, 'the ultimate question is: Did the defendant, with a full knowledge of his legal rights, knowingly and intentionally relinquish them?' " *Commonwealth* v. *Cruz*, *supra* at 687, quoting *Miller* v. *United States*, 396 F.2d 492, 496 (8th Cir. 1968), cert. denied, 393 U.S. 1031 (1969).[10]

In view "of all the circumstances, the lapse of time between the initial warnings [at the house] and the defendant's second [statement at the police station] was not so significant that renewed Miranda warnings were required. See *Commonwealth* v. *Silva*, [388 Mass. 495, 502 (1983)] (time lapse of approximately three hours not significant); *Commonwealth* v. *Cruz*, *supra* (time lapse of approximately three and one-half hours not significant). See also *Stumes* v. *Solem*, 752 F.2d 317, 320 (8th Cir.), cert. denied, 471 U.S. 1067 (1985) (six and one-half hours between warnings and waiver not too long); *United States ex rel. Henne* v. *Fike*, 563 F.2d 809, 814 (7th Cir. 1977), cert. denied, 434 U.S. 1072 (1978) (nine hours between warnings and waiver not too long). Furthermore, at no point did the defendant request an attorney or assert his right to silence. See *Commonwealth* v. *Harvey*, 390 Mass. 203, 205-206 (1983) (statement suppressed where defendant advised of rights, asserted right to remain silent, and approximately eight hours later police elicited statement without readvising him of his rights)."

[10]Our resolution of this issue also disposes of the defendant's contention that he was not asked whether he wished to continue with his waiver until nine hours after his arrest. There was no further conversation between the police and the defendant after the Barrett-Gomes interview until after the warnings had been repeated, first at 4:59 A.M., and then again at approximately 6:50 A.M.

*Commonwealth* v. *Mello, supra* at 386. Moreover, the defendant had been advised of his rights twice.

The defendant contends that the police manipulated the situation by advising him that he was not in custody, thereby depriving him of the ability to understand the gravity of his situation, and that, because Miranda warnings were not repeated, he could not appreciate the rights he purportedly had waived. He further claims that he had not been advised that he could stop answering questions at any time.[11]

There is no evidence that the incorrect information as to his custody status affected the validity of the defendant's waiver. See *Commonwealth* v. *Shine*, 398 Mass. 641, 651 (1986) (fact that police told defendant he was not under arrest and was " 'free to leave,' an admittedly misleading statement," is not evidence defendant was "trick[ed]" into making statements). Similarly here, there is no evidence that being told he was not "under arrest" tricked the defendant into making any statements. The evidence is to the contrary. For example, when interviewed by the trooper at the police station, the defendant repeated much of the same story he had given before; and, later, after his arrest for murder and after reading and signing a Miranda form,[12] the defendant gave a further interview providing once more essentially the same information.

As discussed with respect to the defendant's claims that his intoxication rendered his statements at the Crowninshield home involuntary, the defendant's intoxication did not affect the validity of his waiver at the police station. The defendant did not have any further alcohol and there is no evidence that he was any less rational or coherent than before. There is ample evidence in the record to warrant the inference that the defendant fully understood his legal rights, and knowingly and intelligently waived them. *Commonwealth* v. *Mello, supra* at 386.

---

[11]We do not require that the defendant be informed of his right to terminate questioning, a so-called "fifth" Miranda warning. *Commonwealth* v. *Smith*, 426 Mass. 76, 81 (1997). *Commonwealth* v. *Lewis*, 374 Mass. 203, 205 (1978).

[12]This appears to be the repetition of the Miranda warnings to which the defendant refers when he states that the warnings were not provided again until nine hours after his original arrest.

3. *Instruction on joint venture.* The trial judge instructed on both joint venture and principal liability. In its presentation of the case, the Commonwealth did not appear certain whether the defendant himself killed David or whether he assisted Lillian (or even whether Steve Andrews was involved). Given the nature of the evidence, the Commonwealth was not able to present one consistent theme as to the role of each participant. In its opening statement, the Commonwealth's theory appeared to be that the defendant alone committed the murder. As evidence was introduced, the judge indicated that a joint venture theory supported the admission of at least some of Lillian's statements. The Commonwealth's closing was in large part devoted to a review of the evidence demonstrating that this was a murder, not a suicide, without particular emphasis on whether the defendant was solely responsible or responsible as a joint venturer. (The defense was essentially that this was a suicide, not a murder.)

The defendant makes several arguments concerning joint venture. He claims that the judge should not have instructed on both joint venture and principal liability because the evidence was insufficient to support a joint venture theory. Rather, he argues all the evidence was that he was the sole actor in the alleged homicide. He also argues that the Commonwealth was precluded from asserting joint venture because it did not present such a theory in its opening statement or closing argument. Finally, the defendant maintains that the Commonwealth has improperly relied on "Steve Andrews" as a joint venturer. We conclude that there was sufficient evidence to support a joint venture theory of liability, that the Commonwealth was not precluded from relying on that theory, and that references to Steve Andrews do not alter that conclusion.

An instruction is proper if it is supported by any hypothesis of the evidence. See *Commonwealth* v. *Thayer*, 418 Mass. 130, 132 (1994). Joint venture is established if the Commonwealth proves beyond a reasonable doubt (1) that the defendant was present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the

other if necessary.[13] *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). A joint venturer is "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime."[14] *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). "The elements of the [crime of murder] are not determined or influenced by whether the defendant was the sole perpetrator or only one of several participants in the crime[] [as long as] [t]he evidence was sufficient to show that the defendant was at least a participant, even if he was not the sole perpetrator, and that he possessed the state of mind required for guilt. Nothing further [is] required for conviction." *Commonwealth* v. *Dyer*, 389 Mass. 677, 683 (1983).

It is not necessary that the Commonwealth prove the identity of the other joint venturer or joint venturers, as long as the evidence supports the existence of some principal other than the defendant and that the defendant shared the other's intent and was available to help if needed. See *Commonwealth* v. *Drumgold*, 423 Mass. 230, 254 (1996) (defendant may be convicted of murder on joint venture theory without proof of identity of other joint venturer or joint venturers). Further, it is not necessary that the Commonwealth prove "the precise conduct of each [individual] if there [is] evidence that a [homicide] took place." *Commonwealth* v. *Bianco, supra* at 367. "Direct evidence of who shot the victim[] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] [killed]' the victim[]." *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994).

The evidence was sufficient to warrant a finding that the defendant was guilty of murder committed with extreme atrocity or cruelty as a joint venturer. See *Commonwealth* v.

---

[13]A second theory of joint venture permits the defendant's conviction as a principal when he is not present at the scene "so long as the jury [find] [he] had actually associated [himself] with the criminal venture and assisted in making it a success." *Commonwealth* v. *Ortiz*, 424 Mass. 853, 858-859 (1997).

[14]The mental state required for murder in the first degree committed with extreme atrocity or cruelty under both joint venture and individual liability theories is that the defendant acted with malice aforethought. *Commonwealth* v. *Perry*, 432 Mass. 214, 221 (2000).

*Drumgold, supra.* The defendant's own statements to the police and others were that he did not kill the victim, but rather that he severely beat the victim and then, after the victim bled from wrist wounds, he helped hide the body in the freezer. In his statements to various individuals and in his letters to Lillian, the defendant implicated her and Steve Andrews as those who had been involved in the death of the victim. The defendant also stated that Lillian was the one who introduced the knife into the events leading to the victim's death. Other evidence indicated that the defendant shared in this venture: he admitted that he beat the victim severely at Lillian's request; he watched the victim bleed to death; he spit on the body; he assisted in covering up the death by hiding the body in the freezer and participating in Lillian's lies to friends and to the police about the victim's whereabouts; and he helped Lillian sell the victim's belongings. This evidence was sufficient for a rational jury to find beyond a reasonable doubt that the defendant was a joint venturer. *Commonwealth* v. *Nichypor*, 419 Mass. 209, 212 (1994), and cases cited.[15]

The defendant further argues that the Commonwealth could not rely on joint venture liability because its theme throughout was that the defendant was the sole actor and the Commonwealth did not present a joint venture theory in its opening or in its closing. The opening and closing statements are not evidence and do not bind the Commonwealth as to the theories presented. See *Commonwealth* v. *Iacono*, 20 Mass. App. Ct. 83, 86 (1985) (although prosecution had not "centered attention" on joint venture hypothesis, it was right for judge to charge on it if evidence allowed); *Daughtry* v. *Dennehy*, 946 F. Supp. 1053, 1063 (D. Mass. 1996), citing *Commonwealth* v. *Iacono, supra* (judge may instruct jury on theory of joint venture regardless of whether prosecutor requests it, if sufficient evidence exists). Cf. *Commonwealth* v. *Berry*, 431 Mass. 326, 337-338 (2000) (judge entitled to instruct on manslaughter if evidence

---

[15]The defendant's reliance on *Commonwealth* v. *Green*, 420 Mass. 771, 778-781 (1995), is misplaced. In *Green*, there was no evidence that anyone other than the defendant performed the shooting or that the defendant was, by agreement, willing and able to assist a different principal in the shooting. *Id.* at 779. See *Commonwealth* v. *Berry*, 431 Mass. 326, 332-333 (2000).

supports such theory, regardless of focus on that theory).[16] While the Commonwealth argued that the defendant himself killed the victim, there was sufficient evidence for the jury to consider (and the judge to instruct regarding) the theory that the defendant had participated in a joint venture to kill the victim. There was no error.

The defendant also argues that the Commonwealth "apparently makes no claim that the evidence supports the view that Lillian was the principal. Rather the Commonwealth relies on vague references to a person named Steve." The defendant contends that at trial the Commonwealth offered the statements regarding Steve because they were not true and were evidence of consciousness of guilt and that the Commonwealth may not use the statements for conflicting purposes, e.g., as consciousness of guilt *and* to support joint venture. The defendant's contention fails for two reasons. The record does not support the claim that the Commonwealth offered the statements concerning Steve at trial only to show consciousness of guilt. They were not so limited when they were admitted and they were not referred to as such in closing argument. The Commonwealth could introduce the evidence regarding Steve and leave it to the jury to determine which theory it supported. Further, we do not review on appeal the Commonwealth's arguments in its brief but rather its evidence at trial. The evidence at trial supported an alternative theory of joint venture liability, and the instruction on joint venture were therefore appropriate.

4. *Hearsay statements.* The defendant next argues that the judge erred in admitting hearsay statements of Lillian as statements of a joint venturer because there was insufficient evidence of a joint venture. See *Commonwealth* v. *Cruz,* 430 Mass. 838, 844 (2000), and cases cited (extrajudicial statements of joint venturer admissible if joint venture shown by other evidence). The defendant objected to the admission of all these statements. As we have already concluded that there was sufficient evidence of a joint venture, the statements were properly admitted as extrajudicial statements of a criminal joint venturer. *Id.* Com-

---

[16]The defendant can hardly claim surprise from the presentation of this theory to the jury as the judge indicated during trial that extrajudicial statements of Lillian were admissible as statements of a joint venturer.

*monwealth* v. *Collado*, 426 Mass. 675, 681 (1998). The prerequisite for admissibility is that the judge is satisfied by a preponderance of the evidence that a criminal joint venture existed between the declarant and the defendant. *Commonwealth* v. *Cruz, supra.* The statements must also have been made during the pendency of the cooperative effort and in furtherance of its goal. *Id.* "The rule applies to statements made subsequent to the crime, including when the coventurers are attempting to evade arrest." *Commonwealth* v. *Freeman*, 430 Mass. 111, 117 (1999), citing *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 545 (1990).

The defendant further claims error because the judge did not instruct the jury regarding joint venture hearsay. The defendant's argument ignores that he specifically requested the judge not to instruct on this matter. In addition, the defendant objected to an instruction that would permit substantive use of the statements, even though the statements had already been admitted substantively (as there had been no limitation on their admission). We review to determine whether any error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Cruz, supra* at 846. All the statements were admissible on alternative grounds. There was no error.

Many of the statements at issue were not hearsay as they were not offered for their truth. *Commonwealth* v. *Mahar*, 430 Mass. 643, 649 (2000). Some of the statements were made in the defendant's presence and thus qualify as adoptive admissions. See *Commonwealth* v. *Babbitt*, 430 Mass. 700, 705-706 (2000), and cases cited. We consider each category of statement in turn.

a. *Statements not offered for their truth.* Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. See *Commonwealth* v. *Magraw*, 426 Mass. 589, 593 (1998); *Commonwealth* v. *Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 5 (1995). Statements made by Lillian to the waitress, a hairdresser, and Officer Persampieri essentially were that Lillian's husband was alive and living in a monastery and that he left the area because he could not find work. These statements clearly were not offered for their truth; the Commonwealth's evidence was that at the time Lillian made these

statements her husband's body was in her basement freezer. The same is true of Lillian's response to Officer Persampieri when he arrived at her residence. The officer asked Lillian if her husband were home. Lillian answered that he was upstairs and called for him. She called "Spider," and the defendant came downstairs in response. This statement too was not a statement offered for its truth. See *Commonwealth* v. *Reynolds*, 429 Mass. 388, 391 (1999).

b. *Adoptive admissions.* Statements made by Lillian to Countee Gilliam were made in the defendant's presence and admissible as adoptive admissions. "The hearsay exception for adoptive admissions, including admissions by silence, is firmly rooted." *Commonwealth* v. *Babbitt, supra* at 707. Adoptive admissions are "little more than a special case of voluntary admissions by parties." *Id.* at 706. "That exception applies to any statement made in the presence of the defendant to which the defendant's response — whether by oral declaration, by gesture, or by revealing silence — objectively denotes the defendant's acceptance of the statement." *Id.* at 705. The foundation for the evidence is that it is "apparent that the party has heard and understood the statement, that he had an opportunity to respond, and that the context was one in which he would have been expected to respond to an accusation." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 719 (1993), cert. denied, 513 U.S. 835 (1994). Statements within this category are that Lillian said that the victim deserved to die because he had raped her daughter and the defendant or "they" (meaning she and the defendant) had put his body in the freezer; her marriage had been hell and the victim had raped her daughter; after the defendant had learned about the rape, the defendant and the victim began fighting; the victim had told Lillian he could not live without her and she gave the victim a knife which he had used to cut himself and he bled to death. The defendant was present with (and in several instances sitting next to) Lillian when these statements were made; he could have responded and the statements are such that the defendant would be expected to refute them if they were not true. *Id.*

The next set of statements by Lillian was introduced by a waitress at George's Café in Brockton: that Lillian said she

would be marrying the defendant on Valentine's Day; the victim had left to join a monastery in Maine; and that there would be no problem getting a divorce because the defendant "knew lawyers." Again, these statements were made in circumstances that meet the foundation for adoptive admissions. Indeed, Lillian made these remarks when she and the defendant were sitting next to each other in a booth; the "two of them looked at each other and smirked and laughed" when Lillian said that a divorce would be no problem.[17]

The hairdresser saw Lillian and the defendant together at George's Café and testified that Lillian said that she was going to marry the defendant on Valentine's Day and that David "had left and went to a monastery."[18] These, too, were adoptive admissions for the reasons previously stated.

Finally, Officer Persampieri testified to statements by Lillian that her husband was not at home because he had moved to a monastery in Canada about one week earlier. Again, the defendant was present when the statements were made and would have been likely to refute them were it not in his interest to adopt them. Further, after these statements by Lillian, the officer asked the defendant if Lillian's statements about the whereabouts of her husband were true and the defendant responded that it was true, that her husband had moved to Canada about a week before. These statements were thus adopted in fact. Thus, even in the absence of an instruction on joint venture hearsay, there was no error. All the statements at issue were admissible on other grounds.

5. *Statements by the defendant to a reporter.* The Commonwealth introduced evidence of statements that the defendant made to a local newspaper reporter. According to the reporter, he and the defendant "were acquaintances, and, to an extent . . . friends." They had chatted or had drinks together "[p]robably thirty" times. To interview the defendant while he was held pending trial at the Plymouth County house of correction, the reporter represented himself on a visitor's slip used by the facility as a friend of the defendant. The reporter testified that,

---

[17]The statement that the victim had left to join a monastery in Maine was not offered for its truth.

[18]See note 17, *supra.*

had he identified his occupation, he would not have been allowed access to the defendant. However, the reporter did inform the defendant that he was there to interview him for a newspaper story. The reporter also admitted that he knew that the defendant was represented by counsel (with whom the reporter was acquainted) and that counsel undoubtedly would not have permitted the interview. The defendant now argues that these statements were improperly admitted because they were not voluntary (because the reporter misrepresented himself on the visitor's slip and did not contact defense counsel before seeking to interview the defendant) and because they were not preceded by a voir dire hearing.

The defendant's claim that the statements were not voluntary is raised for the first time in this court. We will not consider a claim made for the first time on appeal and we will not ignore on appeal the strategy on which a case is tried. *Commonwealth v. Silva*, 431 Mass. 401, 405 (2000), and cases cited. The defendant never raised the issue of the voluntariness of his statements to the reporter in a pretrial motion to suppress; he did not object on the basis of voluntariness when the Commonwealth called the witness or when the reporter testified concerning the defendant's statements; and he did not request an instruction regarding the voluntariness of those statements. The defendant's failure to object regarding voluntariness is in contrast to his objections on other grounds to discrete portions of the reporter's statements, for example, those that mentioned that the defendant had committed prior crimes. His failure to request an instruction regarding the voluntariness of these statements is also in contrast to his request for an instruction concerning the voluntariness of his statements to the police. Many of the defendant's statements to the reporter were exculpatory, and it may well be that the defendant wanted these statements recounted to the jury by a Commonwealth witness.

As to the defendant's claim that these statements should not have been admitted without a voir dire (passing the fact that he never requested one), we have held that when "the voluntariness of a defendant's statements to private citizens is an issue, the judge should conduct a voir dire to determine the voluntariness of the statements. If the judge determines that the state-

ments are voluntary, in accordance with our 'humane practice,' the issue of voluntariness should be submitted to the jury for consideration." *Commonwealth* v. *Burke*, 414 Mass. 252, 258-259 (1993), quoting *Commonwealth* v. *Allen*, 395 Mass. 448, 456 (1985). The procedure for determining whether a statement to a private citizen was made voluntarily is not required when no issue of voluntariness is presented. *Commonwealth* v. *Allen*, *supra*. The defendant did not raise at trial the issue of the voluntariness of his statements to the reporter. Therefore, we review to determine whether there was error, and if so, if there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588 (2000). There is no reason to believe that the statements made to the reporter were not voluntary. There has been no showing that the statements were not the product of rational intellect or free will. On the contrary, they appear to be a deliberate attempt to present the defendant's version of the events to a friendly reporter. *Commonwealth* v. *Burke*, *supra* at 259 n.9 (self-serving nature of statements belies defendant's claim that trial counsel should have sought to exclude them as involuntary). There was no error.[19]

The defendant also argues that the reporter's action in talking with the defendant without the approval of counsel violates art. 12 of the Massachusetts Declaration of Rights. The reporter admitted that he knew that most attorneys, "almost as a rule of thumb," would not permit a reporter to interview a client, and he knew from experience that the attorney in this case had never permitted such an interview. The protections of the United States Constitution's Fifth and Sixth Amendments do not extend to conversations between the defendant and private citizens who are not acting on behalf of the Commonwealth. Article 12 does not apply. *Commonwealth* v. *Allen*, *supra* at 453-454.

6. *Admissibility of Father Bacon's statements*. The defendant claims that statements made by the victim to Father Bacon were inadmissible hearsay. At trial the defendant did not object to the

[19]The defendant also contends that the reporter's actions should be attributed to the Commonwealth. There was no evidence that the reporter was acting on behalf of the government. The reporter stated the contrary. Indeed, the reporter attempted to, and apparently did, deceive the sheriff's department regarding his status.

admission of these statements. The victim's statements to Father Bacon were not hearsay because they were offered only to prove the victim's state of mind immediately preceding his death, i.e., whether he was intending to commit suicide. This evidence was relevant. The defendant had told the police that the victim killed himself when his wife ordered him "out of the house" on December 26, 1995, because the victim did not want to live if he could not have Lillian. To contradict the statement by the defendant, Father Bacon testified that the victim had called him that same day at 5 P.M. to tell him that he feared for his life and intended to leave the house to find a safe place to live; he planned to divorce Lillian and should never have married her; the devil had taken over his life; and Lillian had come under a bad influence.

"A murder victim's state of mind becomes a material issue if the defendant opens the door by claiming that the death was a suicide . . . ." *Commonwealth* v. *Magraw*, 426 Mass. 589, 594 (1998). The statements of Father Bacon were admissible to refute the defendant's theory of the case, i.e., that the victim had committed suicide. These statements tended to disprove a suicide as they indicate that David was seeking to save his life, not end it, and that he did not choose death rather than life without Lillian. Further, we do not ignore on appeal the strategy on which a case is tried below. *Commonwealth* v. *Silva*, 431 Mass. 401, 405 (2000), and cases cited. The defendant did not object to the statements when an offer of proof was made because, as defense counsel stated, he desired the admission of the testimony regarding the "devil taking over" the victim's life, a statement by the victim arguably supporting the defendant's suicide theory.[20] The defendant now argues that Father Bacon's testimony went far beyond what he had anticipated based on the offer of proof at trial. The defendant did not lodge any objection on this ground when the statements were admitted; regardless, the statements were admissible to indicate the victim's state of mind.

7. *Evidence of victim's hands being tied.* The defendant next argues that the prosecutor improperly cross-examined a defense

---

[20]The judge stated that the defense strategy was manifestly reasonable and made on the basis of "well-reasoned, experienced, competent planning."

expert pathologist regarding the fact that the victim's hands had been tied. The defendant contends that there was no basis for asking that question. Questions asked in bad faith when there is no basis in the record are improper. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 411 & n.8 (1978). It is reasonable to infer from the evidence, however, that the victim's hands *were* tied. Fifteen to eighteen pieces of rope, saturated with blood, were found in a bag with the victim's shirt. The shirt was bloodied at the cuffs. The back of the jeans was also saturated with the victim's blood and the blood was particularly concentrated on the left side. It is reasonable to infer from the blood-soaked ropes and the heavy concentration of bloodstains on the back of the pants that the victim's hands were tied behind his back.[21] The prosecutor's questions were based on the evidence and the reasonable inferences therefrom. *Commonwealth* v. *Blake*, 409 Mass. 146, 161 (1991). The fact that another Commonwealth witness, Trooper Barrett, saw no evidence of tied hands does not affect this inference. The Commonwealth is not limited to the testimony of one witness.

8. *Closing argument.* The defendant challenges several aspects of the prosecutor's closing argument. He contends that the prosecutor (a) made comments that shifted the burden of proof; (b) commented on the defendant's failure to introduce evidence the Commonwealth successfully sought to exclude (psychiatric records of the victim); and (c) insulted defense counsel. He argues that the cumulative effect of these improprieties was to deny the defendant a fair trial.[22]

a. *Burden-shifting argument.* In regard to comments that are claimed to have shifted the burden of proof, the prosecutor stated: "There's no transfer [of blood to the rope] that was suggested by [defense counsel]." There was no objection to this statement. We therefore consider whether, if there were an impropriety, it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991),

---

[21]The medical examiner testified that the lack of ligature marks on the victim was not conclusive as to whether the victim's hands were bound.

[22]The defendant also claims that the prosecutor improperly argued that the victim's hands had been bound with rope. The evidence and the reasonable inferences therefrom supported such an argument. See Part 7, *supra.*

and cases cited. In this statement, the prosecutor was arguing that the evidence did not support an inference of a transfer of blood to the rope from the other items found in the garbage bag with the rope, and to the extent that defense counsel had attempted in cross-examination to suggest otherwise, he was wrong. There was no impropriety.

The defendant next contends that the prosecutor improperly shifted the burden of proof in arguing about the blood saturation on the victim's pants: "If somebody sits in a pool of blood, there's going to be a whole bunch of blood saturation here as . . . the unrefuted [witness] testified to." There was an objection to this statement. References to certain facts as "unrefuted" are improper when the defendant himself is the only one who can contradict the evidence. See *Commonwealth* v. *Domanski*, 332 Mass. 66, 70-71 (1954). Here, however, the word "unrefuted" refers to a fact that could not be at issue, one that is so obvious that it cannot be disputed: if a person sits in a pool of blood, the result will be blood saturation. In context, the impact of the statement was not burden shifting. See *Commonwealth* v. *Rosado*, 408 Mass. 561, 571 (1990) (prosecutor's statement that certain basic facts were not in dispute because they are uncontrovered not comment on defendant's failure to testify).

b. *Comments on the defendant's failure to introduce evidence Commonwealth successfully sought to exclude.* The defendant maintains that the prosecutor improperly commented on the defendant's failure to introduce certain twenty-three year old psychiatric records of the victim, particularly because the Commonwealth had successfully argued for the exclusion of those records. The procedural background regarding the victim's psychiatric records is as follows. The Commonwealth filed a motion in limine to exclude these records. Although the defendant refers to this ruling as an exclusion, the judge clearly deferred a ruling on admissibility and only precluded reference to the records in the opening statements. During trial, although the judge excluded the "package of records," defense counsel was permitted to question the Commonwealth's medical examiner and the defendant's own expert pathologist on the basis of assumptions from the victim's psychiatric records. For example, defense counsel inquired: "And would it be important

for you to know that in August of 1965 . . . that [the victim] reported that he had pulled out his toenails to keep himself from going completely 'out of [his] mind?' " In his closing, defense counsel then argued as if the records had been substantive evidence, stating several times that the victim had pulled out his own toenails during his mental illness. In response, in his closing, the prosecutor said: "Do you have those Bridgewater records before you?" "Did you have any psychiatric evidence before you? No." The defendant objected and the objection was sustained.

It was improper for the prosecutor to comment on the absence of the psychiatric records. *Commonwealth* v. *Burke*, 373 Mass. 569, 575 (1977); *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 9 (1980). Although it is not clear whether the evidence *was* excluded, the Commonwealth may not comment on the defendant's failure to produce evidence. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 240 (1989). However, the improper statement was cured by the judge's careful and thorough instructions on the subject. The judge sustained the defendant's objections to the above statements in the Commonwealth's closing, and, when the prosecutor persisted in this vein, the judge said: "Wait. Let's pause for a moment. The jury will decide the case on the evidence that has been presented to them, and I'm not permitting further argument on that point . . . . It's straying from what the evidence is in the case. Go ahead." Thus, the judge immediately corrected any mistaken impression about the absence of evidence at the time of the improper remark and admonished the prosecutor before the jury. The improper remark was further cured when the judge instructed the jury immediately after the closing arguments: "[Y]ou can't consider it in any way against the defendant, the fact that those documents and complete records are not part of this trial. They weren't marked as an exhibit and they aren't here for you to read. . . . [The prosecutor] made a mistake when he referred to [*sic*] there is no such records in evidence. There is testimony about them and that's part of the evidence, and the lack of any paper copies marked as an exhibit doesn't make the testimony not evidence and cannot be considered against the defendant." At the same time, the judge told the jury that the defense questions to experts

based on the contents of the mental health records were "part of the evidence in the case . . . [w]hat I wanted to point out to you is that is evidence in the case."

In sum, these instructions both chastised the prosecutor and cured his improper reference to the lack of records. Further, because the judge referred to the records as substantive evidence, his instructions provided an unwarranted benefit to the defendant. The defense counsel had improperly used portions of the material in the records as the basis for hypothetical questions and the judge's instruction allowed the jury to consider those questions as if they were evidence in the case. The judge also properly instructed the jury not to consider closing arguments evidence, that if the attorneys argue something not supported by the evidence, the jury should disregard that argument, and that the jury should decide the case based on the evidence. We presume that the jury follow the judge's instructions. *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990). In these circumstances, we are satisfied that the impropriety by the prosecutor in his summation, to which timely objection was made, is unlikely to have affected the jury's verdict, and therefore is not cause for reversal. See *Commonwealth* v. *Barros*, 425 Mass. 572, 582 (1997). Cf. *Commonwealth* v. *Loguidice*, 420 Mass. 453, 456-457 (1995) (no curative instructions given); *Commonwealth* v. *Kozec*, 399 Mass. 514, 526 (1987) (prosecutor's closing argument exceeded limits of reasonable inferences from evidence, requiring reversal of conviction).

c. *Insults directed to defense counsel.* The defendant claims that the prosecutor directed insulting remarks at counsel: the prosecutor referred several times to the fact that the defense closing argument lasted one hour[23] and referred to trial counsel as "Doctor" during the portion of the argument concerning the psychiatric records. The defendant did not object to the statements about the length of the closing. We must consider whether that remark was improper, and, if so, whether it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991). The remark about the

---

[23]The judge had limited the defense closing to forty-five minutes, but nothing further was said concerning the time limit.

length of defense counsel's closing was improper. The length of the closing has no relevance to the case and the criticism of counsel could be attributed to the defendant by the jury. However, we are "substantially confident that, if [these remarks] had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

The defendant did object to the prosecutor's labeling him "Doctor."[24] Assuming this sarcasm amounted to improper criticism of defense counsel, it was insignificant in a six-day trial. *Commonwealth* v. *Purcell*, 423 Mass. 880, 884-885 (1996).

d. *Combined effect of improper remarks.* We must also consider whether, as the defendant claims, the combined effects of these improprieties by the prosecutor constitute prejudicial error. In doing so, we evaluate whether defense counsel seasonably objected to the argument at trial, *Commonwealth* v. *Kozec*, *supra* at 518; whether the judge's instructions on the issues mitigated the error, *id.*; whether the prosecutor's improprieties went to the heart of the issues at trial or concerned collateral matters, *Commonwealth* v. *Shelley*, 374 Mass. 466, 470-471 (1978), *S.C.*, 381 Mass. 340 (1980); and finally, whether the improper remarks possibly made a difference in the jury's conclusions. *Commonwealth* v. *Kozec*, *supra*. Having reviewed the closing argument, we conclude that the cumulative effect of the improper remarks could not possibly have made a difference and do not constitute prejudicial error. *Commonwealth* v. *Borodine*, 371 Mass. 1, 11-12 (1976), cert. denied, 429 U.S. 1049 (1977).

9. *Moral certainty language.* The defendant claims that the judge's use of "moral certainty" language from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), in the absence of a complete reading of Webster's reasonable doubt instruction was misleading and improper. The defendant objected to the judge's moral certainty language both during the charge conference and after the instructions were given. Key portions of the instructions appear below.[25]

We have upheld the use of moral certainty language in a

---

[24]The judge overruled the objection.

[25]"What do we mean by proof beyond a reasonable doubt? Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. Everything,

reasonable doubt instruction "if it is linked with language that lends content to the phrase." *Id.* at 345. An example of such appropriate linkage is found in *Commonwealth* v. *Andrews*, 427 Mass. 434, 444 n.9 (1998), where the judge instructed that reasonable doubt exists if after consideration of all the evidence the jurors cannot say they feel "an abiding conviction to a moral certainty of the truth of the charge." This language "used 'moral certainty' in the context of the traditional instruction from [*Webster*]." *Id.* at 444. The judge's charge in this case was similar to that in the *Andrews* case. The jurors were instructed that they must have "an abiding conviction to a moral certainty that the charge is true." Thus, as in the *Andrews* case, the charge was sufficient.

The defendant also contends that the judge failed to include the following language regarding the presumption of innocence at the outset of the *Webster* charge: "The burden of proof is upon the prosecutor. All the presumptions of law independent of evidence are in favor of innocence; and every person is presumed to be innocent until he is proved guilty. If upon such proof there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal." We do not require that the presumption of innocence language that is contained in the *Webster* reasonable doubt instruction be recited as a part of the *Webster* charge. Nevertheless, the judge preceded his *Webster* charge with instructions that essentially provided the jurors with the language the defendant claims was omitted.[26]

It bears repeating that we encourage but do not require judges

depending upon human evidence, is open to some possible or imaginary doubt. A charge is proved beyond a reasonable doubt if, after you have compared and considered all the evidence, you have in your minds an abiding conviction to a moral certainty that the charge is true.

"It is not enough to establish a probability of guilt, even a strong one, based on chances. Instead, the evidence must convince you of the truth of the charge to a reasonable and moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of the jurors who are sworn to act conscientiously upon the evidence. This is what we mean by proof beyond a reasonable doubt."

[26]"Under our laws, ladies and gentlemen, a defendant is presumed innocent until proven guilty. The presumption remains unless the evidence proves beyond a reasonable doubt that the defendant is guilty of the charge.

"The verdict must be based on the evidence. The verdict cannot be based on prejudice, suspicion, or guesswork. The indictment is not evidence. The

to use the *Webster* definition of proof beyond a reasonable doubt. See *Commonwealth* v. *Powell, ante* 399, 405 (2001). Nevertheless, we do not require judges to charge in the exact words of *Webster. Commonwealth* v. *Randolph,* 415 Mass. 364, 367 (1993).

10. *Relief pursuant to G. L. c. 278, § 33E.* Having reviewed the whole record, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to direct entry of a lesser degree of guilt.

*Judgment affirmed.*

fact that a person has been indicted or charged or arrested is not evidence of guilt.

"The defendant is not required to prove innocence or present any evidence in his own behalf. The burden of proof is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charge. If the evidence convinces the jury beyond a reasonable doubt that he's guilty of a charge, the jury must find him guilty on that charge.

"If, upon the evidence, a reasonable doubt remains, the defendant is entitled to the benefit of it, and the jury must find him not guilty on that charge."